**UNITED STATES of America, Appellee,**

v.

**Mark JESSUP, Defendant, Appellant.**

**No. 84–1983.**

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1985.

Decided Feb. 25, 1985.

James E. Carroll, Boston, Mass., with whom Robert D. Canty and Gaston Snow & Ely Bartlett, Boston, Mass., were on brief for defendant, appellant.

William F. Weld, U.S. Atty., Boston, Mass., with whom Gary S. Katzmann, Oliver C. Mitchell, Jr., and Evan M. Slavitt, Asst. U.S. Attys., Boston, Mass., were on brief for appellee.

Before BREYER, ALDRICH and TOR-RUELLA, Circuit Judges.

BREYER, Circuit Judge.

This appeal challenges the constitutionality of a provision of the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.*, that requires judicial officers making bail decisions to apply a rebuttable presumption that one charged with a serious drug offense will likely flee before trial. 18 U.S.C. § 3142(e). We find that Congress has acted within the Constitution's prescribed limits in creating this rebuttable presumption and that the magistrate and district court have acted within their lawful authority in applying it, and related statutory provisions, to the appellant Mark Jessup. We affirm the district court's decision to deny him bail and to hold him in custody pending his trial.

I

The Bail Reform Act of 1984 ("the Act") makes it, in one respect, harder and, in another respect, easier for judicial officers to order pretrial detention of those accused of crimes. It makes it harder by specifying explicitly what was implicit in prior law, namely that magistrates and judges cannot impose any "financial condition" that will

result in detention. § 3142(c). (*See* Appendix A, *infra*, for text of relevant portions of the Act.) High money bail cannot be used as a device to keep a defendant in custody before trial. The Act makes detention easier by broadening the category of persons whom the officer can order detained. And, the Act specifies that a judicial officer shall order detention if he

> finds that no condition or combination of conditions [attaching to release] will reasonably assure the appearance of the person as required and the safety of any other person and the community....

§ 3142(e). The Act sets forth procedures to be used in applying this standard. It provides a list of factors that the officer is to weigh when doing so, § 3142(g); and it creates several "rebuttable presumptions" that the officer is to use when applying the basic standard.

This case concerns one of the "rebuttable presumptions" that the Act creates. It states

> Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)....

§ 3142(e).

■ The magistrate here used the presumption in deciding to detain appellant Jessup. The magistrate found that Jessup posed a threat to the safety of the community in that, if released, he might continue to commit crimes. The magistrate also found that, if released, there was a substantial risk that Jessup would flee. In particular, the magistrate stated

> I am equally of the view that the defendant has not rebutted the presumption that no non-financial conditions or combination of non-financial conditions of release would reasonably assure his pres-

ence. The defendant is charged with a serious crime and the Government's evidence is strong. The defendant has been in this state for only two years; he has no family or relatives living here. In all the circumstances, I do not believe the fact that the defendant is engaged to a Massachusetts resident would deter him from fleeing the jurisdiction in view of the seriousness of the crime charged and the strength of the evidence against him.

Given this alternative basis for the magistrate's decision, we need not consider the Act's "dangerousness" provisions or the magistrate's "dangerousness" finding. It is well established that the government can keep a defendant in custody to secure his presence at trial. *See Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 1 (1951) ("The right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty."); *United States v. Abrahams,* 575 F.2d 3, 8 (1st Cir.) (holding that bail may be denied in exceptional circumstances where financial condition of release cannot reasonably assure presence of defendant at trial), *cert. denied,* 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978). Thus the constitutional issue presented here is whether the government can use the Act's rebuttable presumption in doing so.

## II

Before turning to the constitutional question, we must first decide what the rebuttable presumption means. What kind of burden is it designed to impose upon a defendant? Or, to cast the question in terms traditionally used in the law of evidence, does it impose a "burden of persuasion" or only a "burden of production"? *See generally* C. McCormick, *Evidence* § 342 *et seq.* (2d ed. 1972). If the former, the alleged drug offender would have to *prove* he would not flee—*i.e.,* he would have to *persuade* the judicial officer on the point. If the latter, he would only have to introduce a certain amount of evidence contrary to the presumed fact; no change in the

burden of persuasion is effected. Where the burden of persuasion lies may make a practical difference to a magistrate or judge genuinely uncertain on the basis of what the parties have presented.

▮ The United States Attorney here suggests that Congress meant the presumption to shift the burden of persuasion to the defendant. And he cites a district court case, *United States v. Aiello*, 598 F.Supp. 740 (S.D.N.Y.1984), in support of this view. In two other cases, however, it has been held that Congress did not intend to shift the burden of persuasion to the defendant but intended to impose only a burden of production. *See United States v. Payden*, 598 F.Supp. 1388, 1397 (S.D.N.Y.1984); *United States v. Chimurenga*, No. 84 Cr. 818 (RLC), S.D.N.Y. Nov. 5, 1984 (Grubin, Mag.). We believe the latter interpretation is correct.

Our reasons for believing that the burden of persuasion does not shift include the following. First, we are chary of interpreting ambiguous language to mandate pretrial confinement where evidence before a magistrate is indeterminate. Although pretrial confinement to prevent flight is not punishment, but rather one of various restrictions on the freedom of an accused person aimed at facilitating trial, *see Bell v. Wolfish*, 441 U.S. 520, 535–39, 99 S.Ct. 1861, 1871–74, 60 L.Ed.2d 447 (1979), it is still a most severe restriction requiring clear cause.

Second, the Senate Judiciary Committee Report explaining the new presumption, while arguably ambiguous, does not suggest that Congress meant to impose a burden of persuasion on the defendant. To understand the relevance of the Report's description, one must realize that § 3142(e) creates not only the drug offender presumptions already mentioned (concerning "flight" and "danger") but it also creates a rebuttable presumption that one previously convicted of having committed a crime while free on bail is sufficiently "dangerous" to warrant detention. The Report describes both of these presumptions in the

same place. It says that the object of this last presumption is to shift the burden to the defendant *to establish a basis for concluding* that there are conditions of release sufficient to assure that he will not again engage in dangerous criminal activity pending his trial.

S.Rep. No. 225, 98th Cong., 1st Sess. 19 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News, pp. 1, 22 (emphasis added). The position of this sentence in the Report, its language, and the nature of the language of the statutory presumption all suggest that the words "establish a basis for concluding" aptly describe the intended effect of *both* § 3142(e) presumptions. And, these words do not say that the burden of persuasion shifts to the defendant, nor do they imply that it is up to the defendant to persuade the judicial officer.

Third, a later section in the Act, § 3148(b), establishes another similar presumption, this time in respect to a person who is released on bail (or the equivalent) and *then* commits a crime. The Act requires that such a person be brought back before the magistrate, who will consider whether to revoke his bail and detain him. The Act tells the magistrate that, if he finds probable cause to believe the person committed another crime while on release, he is to presume (subject to rebuttal) that detention is necessary to protect the community from still further crimes. That is to say, the Act applies a rebuttable presumption of "dangerousness." In describing the presumption, the Committee Report states that

the establishment of probable cause to believe that the defendant has committed a serious crime while on release constitutes compelling evidence that the defendant poses a danger to the community, and, once such probable cause is established, it is appropriate that the burden rest on the defendant *to come forward with evidence* indicating that this conclusion is not warranted in his case.

S.Rep., *supra*, at 36 (emphasis added), 1984 U.S.Code Cong. & Admin.News, p. 39. This language ("come forward with evi-

dence") is traditionally used to suggest a shift in the burden of production, not of persuasion. (Compare, for example, the language used by the congressional Conference Committee which, in preparing the Federal Rules of Evidence, noted that a

> presumption shifts to the party against whom it is directed the burden of *going forward with evidence* to meet or rebut the presumption, but it does not shift to that party the burden of persuasion on the existence of the presumed fact.

Fed.R.Evid. 301, Notes of Conference Committee (emphasis added).) The Act then does not impose a burden of persuasion even upon a defendant found likely to have just committed a crime while on bail. It would be anomalous to interpret the Act as imposing such a burden on those who committed such crimes in the past or on those charged with drug offenses, since they, if anything, present less risky cases.

Fourth, an examination of a related section of the Act, § 3143, shows that Congress knew how to create a 'burden of persuasion' when it wanted to do so. Section 3143 creates a presumption that a defendant who has been convicted of a crime may not be released pending his appeal or sentencing unless he shows "by clear and convincing evidence that [he] is not likely to flee or pose a danger to the safety of any other person or the community." § 3143(a), (b). (This provision differs from the Bail Reform Act of 1966, in which even convicted defendants were presumptively entitled to the same opportunity for release on bail as defendants who had not already been convicted. *See* 18 U.S.C. former § 3148.) The Judiciary Committee Report notes that

> The Committee intends that in overcoming the presumption in favor of detention [in § 3143] *the burden of proof* rests with the defendant.

S.Rep., *supra*, at 27 (emphasis added), 1984 U.S.Code Cong. & Admin.News, p. 30. Congress could have used language similar to that of § 3143, or Report language similar to that just quoted, if it had intended § 3142(e) to impose a similar burden of persuasion. The absence of such language, and the proximity of §§ 3142 and 3143, reinforces our conclusion that § 3142 was meant to impose only a burden of production.

The government's strongest argument to the contrary rests upon two propositions:

> (a) Congress did not intend to create a set of presumptions with little or no practical effect; and
>
> (b) a 'burden of production' presumption would have little practical effect.

We agree with the first part of the argument: Congress did intend the presumption to have a practical effect. This can be seen in the Report's discussion of the § 3142(e) presumptions, which says that in the circumstances that trigger the presumption (a serious drug offense charge; past commission of a crime on bail), a *"strong probability arises* that no form of conditional release will be adequate." S.Rep., *supra*, at 19 (emphasis added), 1984 U.S.Code. & Admin.News, p. 22. In respect to the § 3148(b) presumption, the Report adds that

> the establishment of probable cause to believe that the defendant has committed a serious crime while on release constitutes *compelling evidence* that the defendant poses a danger to the community.

*Id.* at 36 (emphasis added), 1984 U.S.Code Cong. & Admin.News, p. 39.

We do not agree, however, with the second part of the argument. It is true that, under the prevailing judicial view, a "burden of production" presumption is a "bursting bubble." *See* C. McCormick, *Evidence* § 345 at 821 (2d ed. 1972) ("bursting bubble" theory is "the most widely followed theory of presumptions in American law"); *Legille v. Dann,* 544 F.2d 1, 6 (D.C.Cir. 1976) (same). Under this theory, the presumption requires the 'presumed against' party to introduce evidence, but, once he does so, the presumption "bursts" and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption. Since a defendant can always provide the magistrate with

*some* reason to believe him a good risk, a "bursting bubble" approach might render the presumption virtually meaningless, contrary to Congress's clear intent.

Nonetheless, Congress does not *have* to make a "bursting bubble" of each "burden of production" presumption. We believe that here it has *not* done so; rather, it has created a "burden of production" presumption that *does* have significant practical impact. That is to say, the Report's language, together with the legislative history of the Act (with its emphasis on the importance of the presumption), indicates to *us* that Congress meant to impose a "burden of production" presumption, but it did not intend to make that presumption a "bursting bubble."

We are led to this conclusion in part by the strain of legal thought which has marked out a "middle ground" for some presumptions—holding that they neither shift the burden of persuasion nor "burst" once contrary evidence is presented. *See* Morgan, *Instructing the Jury upon Presumptions and Burdens of Proof,* 47 Harv.L.Rev. 59, 82–83 (1933); 21 C. Wright & K. Graham, *Federal Practice and Procedure (Evidence)* § 5122 at 566 (noting that while courts pay "lip service" to "bursting bubble" approach, "most of them [have] felt compelled to deviate from the 'bursting bubble' theory at one time or another in order to give greater effect to presumptions"); *see generally* Hecht & Pinzler, *Rebutting Presumptions: Order Out of Chaos,* 58 B.U.L.Rev. 527 (1978). Under this view, to remove the presumption entirely from a case once conflicting evidence has been presented could undercut the legislative purpose in creating the presumption (say, an intent to have courts follow the legislature's assessment of probabilities or the furtherance of some other specific public policy). The House Judiciary Committee adopted exactly this sort of "intermediate position" in its Report on Fed.R. Evid. 301. The Committee Report said that the 'bursting bubble' approach gave presumptions "too slight an effect," and proposed a version of Fed.R.Evid. 301 under which presumptions would "not vanish upon the introduction of contradicting evidence" but would remain available "to be considered by the jury." *See* Fed.R.Evid. 301 and accompanying committee reports; Hearings on Proposed Rules of Evidence Before the Subcommittee on Criminal Justice of the House Comm. on the Judiciary (Supp.), 93d Cong., 1st Sess., ser. 2, at 364 (Comm.Print 1973). A number of courts have also adopted this 'middle ground' view of presumptions. *See, e.g., Montgomery County Fire Board v. Fisher,* 53 Md.App. 435, 454 A.2d 394, 400 (1983) (statutory presumption that firefighter's heart disease is job related "does not disappear like the bursting bubble upon generation of a jury issue; rather it remains in the case as one of the elements to be considered"); *Wright v. State Accident Insurance Fund,* 289 Or. 323, 613 P.2d 755, 759–60 (1980) (same presumption) ("If there is opposing evidence, the trier of fact must weigh the evidence, giving the presumption the value of evidence, and determine upon which side the evidence preponderates."); *Starr v. Campos,* 134 Ariz. 254, 655 P.2d 794, 796 (1982) (jury weighs blood alcohol intoxication presumption along with other evidence); *Walker v. Butterworth,* 599 F.2d 1074, 1078 (1st Cir.1979) (sanity presumption carries evidentiary value).

The case for a "middle ground" position is particularly strong in this setting of a detention hearing, where the procedures are informal and there is no jury. In such a setting, there is no occasion for the presumption to play its traditional practical role in the judge's decision about whether to direct a verdict (if no contrary evidence is produced) or whether, instead, to send an issue to the jury. In a detention hearing there is no jury. Thus a "bursting bubble" approach would call on the judge (or magistrate) to consider the presumption and then, if it is met with contrary evidence, to erase the presumption from his mind—not a task that is psychologically easy to accomplish.

Moreover, here the Act's history suggests a relatively obvious way to apply this presumption along the lines of the House Judiciary Committee's "intermediate position"—giving it some weight, without shift-

ing the burden of persuasion. Congress investigated a general problem, the problem of drug offenders and flight. After hearing evidence, Congress concluded that "flight to avoid prosecution is particularly high among persons charged with major drug offenses." S.Rep., *supra*, at 20, 1984 U.S.Code Cong. & Admin.News, p. 23. It found that "drug traffickers often have established ties outside the United States ... [and] have both the resources and foreign contacts to escape to other countries...." *Id.* Congress then wrote its drug offender/flight presumption. These facts suggest that Congress intended magistrates and judges, who typically focus only upon the particular cases before them, to take account of the more general facts that Congress found. In order to "rebut" the presumption, the defendant must produce some evidence; and the magistrate or judge should then still keep in mind the fact that Congress has found that offenders, as a general rule, pose *special* risks of flight. The magistrate or judge should incorporate that fact and finding among the other special factors that Congress has told him to weigh when making his bail decision. *See* § 3142(g) (judicial officer shall weigh, among other things, "nature of circumstances of offense," "weight of evidence," "history and characteristics of the person including ... character, physical and mental condition, family history ...,  past conduct ...," and so forth). Congress did not precisely describe just how a magistrate will weigh the presumption, along with (or against) other § 3142(g) factors. But the same can be said of each of the several § 3142(g) factors. It is not unusual for Congress to instruct a magistrate or judge conscientiously to weigh several different factors without specifying precise weights for each. *See, e.g.,* Criminal Fine Enforcement Act of 1984, 18 U.S.C. § 3622.

Finally, the most common criticism of the "intermediate position" is that it is confusing; a jury, for example might not understand how to weigh a presumption against direct evidence. *See* Senate Judiciary Committee Notes on Fed.R.Evid. 301; C. McCormick, *Handbook of the Law of Evidence* § 345 at 825 & n. 60 (1972). This criticism has less weight in the context of a detention hearing, where no jury is involved, and the magistrate or judge is accustomed to the process of weighing several competing factors.

Since the presumption is but one factor among many, its continued consideration by the magistrate does not impose a burden of persuasion upon the defendant. And, since Congress seeks only consideration of the general drug offender/flight problem, the magistrate or judge may still conclude that what is true in general is not true in the particular case before him. He is free to do so, and to release the defendant, as long as the defendant has presented some evidence and the magistrate or judge has evaluated all of the evidence with Congress's view of the general problem in mind. It is worth noting that the Act requires that all detention orders "include written findings of fact and *a written statement of the reasons for the detention.*" § 3142(i)(1) (emphasis added). Thus, the defendant is protected from a weighing of factors that is arbitrary, or not in keeping with the Act.

In sum, the congressional report language about the presumption's nature and effect, the unsuitability of a 'bursting bubble' presumption in an informal, nonjury hearing, and the availability of a "middle way," lead us to reject the government's "burden of persuasion" argument. Insofar as a magistrate or judge previously shared Congress's views about the general nature of the drug offender/flight problem, use of the new presumption might not make much difference. But, insofar as the magistrate or judge did not previously share those views, the presumption will have a significant practical effect. And this, we think, is what Congress intended.

### III

■ We turn now to Jessup's claim that use of the drug offender/flight presumption is unconstitutional because it deprives him of his "liberty ... without due process of law." U.S. Constitution, Amendment V.

In deciding whether this presumption makes Jessup's bail procedures constitutionally unfair, we shall ask 1) whether the presumption represents a reasonable congressional response to a problem of legitimate legislative concern, and 2) whether the presumption increases the risk of an erroneous deprivation of liberty—*i.e.*, will it likely increase the risk that magistrates will release or detain the wrong people? *See Schall v. Martin,* — U.S. —, 104 S.Ct. 2403, 2409, 81 L.Ed.2d 207 (1984); *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (determining procedural fairness by examining private interests, governmental interests, and risk of error).

The first question must be answered, on the record before us, in the government's favor. The government's interest in securing the appearance of a defendant at trial has been held important enough to warrant pretrial detention where there is a significant risk of flight. *See Stack v. Boyle,* 342 U.S. at 4, 72 S.Ct. at 3; *United States v. Abrahams,* 575 F.2d at 8. Both the predecessor of the current law (the Bail Reform Act of 1966) and the new Act specifically provided for such detention, *see* 18 U.S.C. § 3146(a) (superceded); 18 U.S.C. § 3142(f)(2)(A) (current law).

Moreover, Congress held hearings and heard considerable evidence that drug offenders posed a special risk of "flight." It described this evidence, and the problems revealed as follows:

[T]he Committee received testimony that flight to avoid prosecution is particularly high among persons charged with major drug offenses. Because of the extremely lucrative nature of drug trafficking, and the fact that drug traffickers often have established substantial ties outside the United States from whence most dangerous drugs are imported into the country, these persons have both the resources and foreign contacts to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences. Even the prospect of forfeiture of bond in the hundreds of thousands of dollars has proven to be ineffective in assuring the appearance of major drug traffickers. In view of these factors, the Committee has provided in section 3142(e) that in a case in which there is probable cause to believe that the person has committed a grave drug offense, a rebutable [sic] presumption arises that no condition or combination of conditions will reasonably assure the appearance of the person and the safety of the community.

. . . . .

The rationale for the use of financial conditions of release is that the prospect of forfeiture of the amount of a bond or of property used as collateral to secure release is sufficient to deter flight. However, when the proceeds of crime are used to post bond, this rationale no longer holds true. In recent years, there has been an increasing incidence of defendants, particularly those engaged in highly lucrative criminal activities such as drug trafficking, who are able to make extraordinarily high money bonds, posting bail and then fleeing the country. Among such defendants, forfeiture of bond is simply a cost of doing business, and it appears that there is a growing practice of reserving a portion of crime income to cover this cost of avoiding prosecution.

S.Rep., *supra,* at 20, 23–24 (citations omitted), 1984 U.S.Code Cong. & Admin.News, pp. 23, 26, 27. The evidence that was presented in congressional hearings on this subject gave Congress, at the least, a substantial basis for reaching these conclusions. *See, e.g.,* "Bail Reform," Hearings Before the Subcommittee on the Constitution of the Senate Judiciary Committee, 97th Cong., 1st Sess., Sept. 17, Oct. 21, 1981 at 67, 70 (graphs 1, 2) (Comm.Print 1982) (suggesting that in ten districts studied, drug offenders account for about *one-sixth* of all crimes charged but about *one-half* of all bail jumpers). *See also* sources collected in Appendix B. The drug offender/flight presumption seems a reasonable response to this general problem, re-

quiring that a charged drug offender produce some evidence that he does not present a special risk and then requiring the magistrate to review the matter with Congress's general findings in mind.

Jessup, and a defendant in a related case, *United States v. Lepere*, No. 85–1012 (1st Cir., argued Feb. 4, 1985), attack the presumption in part by challenging the underlying congressional conclusions—by arguing that the evidence does not show a serious, special drug offender/flight problem. The Supreme Court, however, has cautioned us to give "significant weight" to the "capacity of Congress to amass the stuff of actual experience and cull conclusions from it." *Usery v. Turner Elkhorn Mining*, 428 U.S. 1, 28, 96 S.Ct. 2882, 2898, 49 L.Ed.2d 752 (1976). We cannot here reevaluate the statistical studies or other evidence presented at congressional hearings. To do so would invite potentially endless, unresolvable scholarly argument. (Statistical assumptions, for example, are almost always open to plausible attack.) And, doing so would overlook the fact that factual judgments in Congress (as elsewhere) often rest, less upon the gathering of numbers, than upon instinctive evaluation of the views of those with practical experience in the field—views that may reach the legislative ear both informally and formally. Given Congress's constitutional authority and practical factgathering power—a power far greater than that of courts—we are not persuaded that Congress's conclusions concerning the drug offender/flight problem are without substantial basis in fact, or that Congress's solution is unreasonable. And, we conclude that the government's interest in the presumption is a strong and legitimate one.

We also find that the presumption does not significantly increase the risk of an "erroneous deprivation" of liberty. *Mathews v. Eldridge*, 424 U.S. at 324–25, 96 S.Ct. at 897–98. The presumption shifts the burden of production, not the burden of persuasion. It applies only where there is probable cause to believe a person is guilty of a serious crime. The defendant can provide argument and evidence suggesting

that he is not involved in the "highly lucrative" drug operations at the center of congressional concern. The Act further specifically provides a defendant with a hearing at which he

> has the right to be represented by counsel, and, if he is financially unable to obtain adequate representation, to have counsel appointed for him. The person shall be afforded an opportunity to testify, to present witnesses on his own behalf, to cross-examine witnesses who appear at the hearing, and to present information by proffer and otherwise.

§ 3142(f)(2)(B). Although the magistrate will keep the presumption in mind in making a decision, he will do so only as a reminder of Congress's findings. Given the Act's procedural protections, the fact that the presumption does not shift the burden of persuasion, and the presumption's relation to Congress's factfinding powers, we cannot say that it promotes *less*, rather than *more*, accurate decisionmaking. Given the legitimate governmental interest in securing a defendant's appearance at trial, the presumption's restrictions on the defendant's liberty are constitutionally permissible.

Jessup's strongest argument to the contrary rests upon *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), which he cites for the proposition that a presumption in a criminal case is invalid unless there is "substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." *Id.* at 36, 89 S.Ct. at 1548. No one claims, he adds, that despite money bail and other release conditions, drug offenders are *more likely than not* to run away. We note, however, that the *Leary* Court applied this standard to a presumption in the context of a full blown criminal trial, where the presumption was used to establish an important element of the crime that was charged. Here, on the other hand, we deal with a presumption that is applied to a preliminary hearing, where decisions must be made quickly and where the purpose is not to punish but to

increase the likelihood that the trial will go forward. It is well established that the constitutional guarantees at such hearings are less protective of defendants than at trial. *Cf. Gerstein v. Pugh,* 420 U.S. 103, 111–14, 95 S.Ct. 854, 861–63, 43 L.Ed.2d 54 (1975); *United States v. Edwards,* 430 A.2d 1321, 1333–37 (D.C.App.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982). And, what is more to the point, the evidentiary burdens imposed upon the government are also less severe. *Cf. Gerstein v. Pugh,* 420 U.S. at 121, 95 S.Ct. at 866 (approving "informal modes of proof" in probable cause hearings). The Constitution does not require as great a degree of certainty for charging or for securing the presence at trial of one charged as for convicting that person at a criminal trial. In this context then, the substantial basis of information underlying 'drug offender/flight' conclusions is sufficient to meet the Constitution's requirement of adequate support for a presumption. We reject Jessup's claim that more support is necessary.

We do not consider the government's claim that a still lesser test ("some rational connection," *see Usery v. Turner Elkhorn Mining,* 428 U.S. at 28, 96 S.Ct. at 2898) is all that the presumptions need satisfy. This lesser standard, applied by the Supreme Court typically in cases involving economic regulation, *see id.,* may be insufficient here, where personal liberty is at stake.

Finally, Jessup contends that the real purpose of the presumption is not to detain those likely to flee but rather to impose extra punishment upon alleged drug offenders. In deciding whether this is, in fact, its purpose, we must ask whether there is "an alternative purpose" with which the presumption is "rationally ... connected ... [and to which it is] assignable," and whether the presumption is "excessive in relation to the alternative purpose assigned." *Bell v. Wolfish,* 441 U.S. 520, 538, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979) (quoting *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963)). Here,

the "alternative purpose" is obvious, namely Congress's stated object: preventing pretrial flight. For reasons previously given, the presumption does not impose an excessive burden in respect to this purpose. We find no legal basis for viewing the presumption as imposing "punishment." For these reasons, we believe the presumption, as we have interpreted it, is constitutional.

## IV

■ Assuming the presumption's constitutionality, Jessup still claims his detention is unlawful for several reasons. First, he says that he is not the sort of drug offender (*i.e.,* one with important foreign connections) that Congress had in mind when it created the presumption; therefore, the magistrate should not have applied the presumption to him. The conclusion of this argument, however, does not follow from its premise. The presumption applies to Jessup for he fits within its terms. The Act allows him to present all the special features of his case directly to the magistrate. The less those features resemble the congressional paradigm, the less weight the magistrate will likely give to Congress's concern for flight. The individual characteristics of a case and the precise weight to be given the presumption are matters for a magistrate to take into account within the framework of factors set out in § 3142(g). In other words, Jessup's argument goes not to the applicability of the presumption but rather to the weight that should properly be accorded it.

■ Second, Jessup argues that the evidence was insufficient for the magistrate to conclude that "no condition or combination of conditions [attached to release] will reasonably assure ... [his] appearance as required." § 3142(e). Giving appropriate weight to the scope of the magistrate's power to draw conclusions from the evidence presented, *see* C. Wright, *Federal Practice and Procedure: Criminal 2d* § 722 at 160 (1982) ("An order concerning release prior to conviction is to be affirmed

if it is supported by the proceedings below"), we find the evidence sufficient. On October 29, 1984, the magistrate had before him testimony of a DEA agent, Joseph O'Keefe, and the sworn statement of another DEA agent, Stephen Assarian, that Jessup and a codefendant had met with Assarian to arrange for the sale to Assarian of two kilograms of cocaine. Jessup and the codefendant later met with Assarian to consummate the arrangement, and Jessup showed Assarian the cocaine. Assarian and other DEA agents then arrested Jessup and his codefendant. The magistrate found this evidence adequate to establish 'probable cause' that Jessup committed the drug offense with which he was charged.

The magistrate then considered several factors weighing against release: 1) the offense charged was serious; 2) the offense was within Congress's definition of "dangerous federal offenses"; 3) the weight of the evidence against Jessup was strong (in particular, the evidence suggested to the magistrate that Jessup was a "trusted cohort" of his codefendant, who allegedly had been involved in cocaine dealing for some time); 4) Jessup had no relatives in Massachusetts; 5) Jessup had lived in Massachusetts for only two years; and 6) Jessup had been unemployed for six months before his arrest.

The magistrate also considered several factors weighing in favor of Jessup's release. They included 1) Jessup was engaged to a Massachusetts resident; 2) Jessup had a job offer (from his codefendant's brother); and 3) Jessup had no prior criminal record. (The United States Attorney has recently brought to our attention information suggesting that Jessup in fact has a prior criminal record; we have, however, conducted our review of the magistrate's decision on the basis of the record before the magistrate, and we have not considered this new information.)

The magistrate initially thought that several conditions, including posting of the $25,000 bond that Jessup's counsel suggested, *might* prove sufficient to guarantee Jessup's appearance. Reserving decision, the magistrate asked counsel to explain the source of the $25,000, *see* § 3142(g)(4), since Jessup had earlier said that he was indigent. Counsel then responded that Jessup could not raise the $25,000, and that Jessup should be released without the posting of a money bond. At that point, the magistrate concluded that no combination of *non*-financial conditions would prove sufficient to assure both Jessup's "appearance" and the "safety of ... the community."

As previously mentioned, the magistrate's decision rests adequately on the "appearance" ground alone. We believe that the magistrate could reasonably conclude from the facts we have listed that the serious charges, the strong evidence, the lack of Massachusetts connections, the possibility of prior involvement, and the lack of any monetary incentive to return would together create too great a risk of flight. We therefore conclude that the magistrate acted within his lawful powers.

■ Third, Jessup argues that, since the magistrate would have released him had he been able to post $25,000 bail, he must release him anyway. Otherwise, says Jessup, the magistrate violates the next to last sentence in § 3142(c) which says that

The judicial officer may not impose a financial condition that results in the pretrial detention of the person.

In a literal sense, Jessup's failure to meet the "financial condition," while a necessary condition for Jessup's detention, is not in fact its relevant cause. Rather, Jessup is confined because *both* 1) he cannot raise the $25,000, *and* 2) no other set of conditions is sufficient to guarantee his appearance. That the quoted sentence from the Act does not foreclose detention in these circumstances is made very clear by the Senate Report, which states

... section 3142(c) provides that a judicial officer may not impose a financial condition of release that results in the pretrial detention of the defendant. The purpose of this provision is to preclude the sub rosa use of money bond to detain

dangerous defendants. However, its application does not necessarily require the release of a person who says he is unable to meet a financial condition of release which the judge has determined is the only form of conditional release that will assure the person's future appearance. Thus, for example, if a judicial officer determines that a $50,000 bond is the only means, short of detention, of assuring the appearance of a defendant who poses a serious risk of flight, and the defendant asserts that, despite the judicial officer's finding to the contrary, he cannot meet the bond, the judicial officer may reconsider the amount of the bond. If he still concludes that the initial amount is reasonable and necessary then it would appear that there is no available condition of release that will assure the defendant's appearance.

S.Rep., *supra*, at 16, 1984 U.S.Code Cong. & Admin.News, p. 19. This Report language is perfectly consistent with the basic purpose of the Act—to detain those who present serious risks of flight or danger *but not* to detain those who simply cannot afford a bail bond. *See id.* at 9–11.

Fourth, we note Jessup's argument that the $25,000 bond which the magistrate considered setting was constitutionally "excessive." He claims that it was too high because it prevented his release. He has been detained, however, not because he cannot raise the money, but because without the money, the risk of flight is too great. And, as we have previously indicated, it is well established that pretrial detention is constitutionally permissible for such a purpose.

■ Finally, we have asked ourselves whether it is fair to Jessup to affirm the detention order on the basis of an interpretation of the presumption that the magistrate might not have followed. We now hold that the presumption shifts the burden of production not persuasion and that once the defendant produces evidence, the magistrate will keep in mind Congress's general factual view about special drug offender risks, using it where appropriate along with the factors set out in § 3142(g) to judge the risk of flight in the particular case. Did the magistrate here use the presumption more strongly to Jessup's disadvantage? Having reviewed the magistrate's findings, we think not. (*See* pp. 387–88, *supra*). The magistrate wrote that Jessup "has not rebutted" the presumption; but he also goes on to consider "all the circumstances" and then states his belief that Jessup would not be deterred from fleeing. Nothing in the record suggests the magistrate believed Jessup had to shoulder a "burden of persuasion" or that his decision turned upon that point. Of course, Jessup remains free to ask the magistrate for reconsideration of his detention order, *United States v. Anguilo*, 755 F.2d 969, (1st Cir. 1985), a fact that allows Jessup a remedy if we have misread the magistrate's decision.

For these reasons, the judgment below is

*Affirmed.*

## APPENDIX A

### 18 U.S.C. §§ 3142, 3143, 3148

**"§ 3142. Release or detention of a defendant pending trial**

"(a) In General—Upon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be—

"(1) released on his personal recognizance or upon execution of an unsecured appearance bond, pursuant to the provisions of subsection (b);

"(2) released on a condition or combination of conditions pursuant to the provisions of subsection (c);

"(3) temporarily detained to permit revocation of conditional release, deportation, or exclusion pursuant to the provisions of subsection (d); or

"(4) detained pursuant to the provisions of subsection (e).

"(b) Release on Personal Recognizance or Unsecured Appearance Bond.—The judicial officer shall order the pretrial release of the person on his personal recog-

nizance, or upon execution of an unsecured appearance bond in an amount specified by the court, subject to the condition that the person not commit a Federal, State, or local crime during the period of his release, unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community.

"(c) Release on Conditions.—If the judicial officer determines that the release described in subsection (b) will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, he shall order the pretrial release of the person—

"(1) subject to the condition that the person not commit a Federal, State, or local crime during the period of release, and

"(2) subject to the least restrictive further condition, or combination of conditions, that he determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person—

"(A) remain in the custody of a designated person, who agrees to supervise him and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community;

"(B) maintain employment, or, if unemployed, actively seek employment;

"(C) maintain or commence an educational program;

"(D) abide by specified restrictions on his personal associations, place of abode, or travel;

"(E) avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense;

"(F) report on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency;

"(G) comply with a specified curfew;

"(H) refrain from possessing a firearm, destructive device, or other dangerous weapon;

"(I) refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802), without a prescription by a licensed medical practitioner;

"(J) undergo available medical or psychiatric treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;

"(K) execute an agreement to forfeit upon failing to appear as required, such designated property, including money, as is reasonably necessary to assure the appearance of the person as required, and post with the court such indicia of ownership of the property or such percentage of the money as the judicial officer may specify;

"(L) execute a bail bond with solvent sureties in such amount as is reasonably necessary to assure the appearance of the person as required;

"(M) return to custody for specified hours following release for employment, schooling, or other limited purposes; and

"(N) satisfy any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community.

The judicial officer may not impose a financial condition that results in the pretrial detention of the person. The judicial officer may at any time amend his order to impose additional or different conditions of release.

"(d) Temporary Detention To Permit Revocation of Conditional Release, De-

portation, or Exclusion.—If the judicial officer determines that—

"(1) the person—

"(A) is, and was at the time the offense was committed, on—

"(i) release pending trial for a felony under Federal, State, or local law;

"(ii) release pending imposition or execution of sentence, appeal of sentence or conviction, or completion of sentence, for any offense under Federal, State, or local law; or

"(iii) probation or parole for any offense under Federal, State, or local law; or

"(B) is not a citizen of the United States or lawfully admitted for permanent residence, as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(20)); and

"(2) the person may flee or pose a danger to any other person or the community;

he shall order the detention of the person, for a period of not more than ten days, excluding Saturdays, Sundays, and holidays, and direct the attorney for the Government to notify the appropriate court, probation or parole official, or State or local law enforcement official, or the appropriate official of the Immigration and Naturalization Service. If the official fails or declines to take the person into custody during that period, the person shall be treated in accordance with the other provisions of this section, notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings. If temporary detention is sought under paragraph (1)(B), the person has the burden of proving to the court that he is a citizen of the United States or is lawfully admitted for permanent residence.

"(e) Detention.—If, after a hearing pursuant to the provisions of subsection (f), the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any

other person and the community, he shall order the detention of the person prior to trial. In a case described in (f)(1), a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person and the community if the judge finds that—

"(1) the person has been convicted of a Federal offense that is described in subsection (f)(1), or of a State or local offense that would have been an offense described in section (f)(1) if a circumstance giving rise to Federal jurisdiction had existed;

"(2) the offense described in paragraph (1) was committed while the person was on release pending trial for a Federal, State, or local offense; and

"(3) a period of not more than five years has elapsed since the date of conviction, or the release of the person from imprisonment, for the offense described in paragraph (1), whichever is later.

Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), section 1 of the Act of September 15, 1980 (21 U.S.C. 955a), or an offense under section 924(c) title 18 of the United States Code.

"(f) Detention Hearing.—The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) will reasonably assure the appearance of the person as required and the safety of any other person and the community in a case—

"(1) upon motion of the attorney for the Government, that involves—

"(A) a crime of violence;

"(B) an offense for which the maximum sentence is life imprisonment or death;

"(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or section 1 of the Act of September 15, 1980 (21 U.S.C. 955a); or

"(D) any felony committed after the person had been convicted of two or more prior offenses described in subparagraphs (A) through (C), or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) if a circumstance giving rise to Federal jurisdiction had existed; or

"(2) Upon motion of the attorney for the Government or upon the judicial officer's own motion, that involves—

"(A) a serious risk that the person will flee;

"(B) a serious risk that the person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

The hearing shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance. Except for good cause, a continuance on motion of the person may not exceed five days, and a continuance on motion of the attorney for the Government may not exceed three days. During a continuance, the person shall be detained, and the judicial officer, on motion of the attorney for the Government or on his own motion, may order that, while in custody, a person who appears to be a narcotics addict receive a medical examination to determine whether he is an addict. At the hearing, the person has the right to be represented by counsel, and, if he is financially unable to obtain adequate representation, to have counsel appointed for him. The person shall be afforded an opportunity to testify, to present witnesses on his own behalf, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise. The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing. The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence. The person may be detained pending completion of the hearing.

"(g) Factors To Be Considered.—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—

"(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

"(2) the weight of the evidence against the person;

"(3) the history and characteristics of the person, including—

"(A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

"(B) whether, at the time of the current offense or arrest, he was on probation, or parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

"(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(2)(K) or (c)(2)(L), the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

"(h) Contents of Release Order.—In a release order issued pursuant to the provisions of subsection (b) or (c), the judicial officer shall—

"(1) include a written statement that sets forth all the conditions to which the release is subject, in a manner sufficiently clear and specific to serve as a guide for the person's conduct; and

"(2) advise the person of—

"(A) the penalties for violating a condition of release, including the penalties for committing an offense while on pretrial release;

"(B) the consequences of violating a condition of release, including the immediate issuance of a warrant for the person's arrest; and

"(C) the provisions of sections 1503 of this title (relating to intimidation of witnesses, jurors, and officers of the court), 1510 (relating to obstruction of criminal investigations), 1512 (tampering with a witness, victim, or an informant), and 1513 (retaliating against a witness, victim, or an informant).

"(i) Contents of Detention Order.—In a detention order issued pursuant to the provisions of subsection (e), the judicial officer shall—

"(1) include written findings of fact and a written statement of the reasons for the detention;

"(2) direct that the person be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

"(3) direct that the person be afforded reasonable opportunity for private consultation with his counsel; and

"(4) direct that, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the person is confined deliver the person to a United States marshal for the purpose of an appearance in connection with a court proceeding.

The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

"(j) Presumption of Innocence.—Nothing in this section shall be construed as modifying or limiting the presumption of innocence.

"**§ 3143. Release or detention of a defendant pending sentence or appeal**

"(a) Release or Detention Pending Sentence.—The judicial officer shall order that a person who has been found guilty of an offense and who is waiting imposition or execution of sentence, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released pursuant to section 3142(b) or (c). If the judicial officer makes such a finding, he shall order the release of the person in accordance with the provisions of section 3142(b) or (c).

"(b) Release or Detention Pending Appeal by the Defendant.—The judicial offi-

cer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—

"(1) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released pursuant to section 3142(b) or (c); and

"(2) that the appeal is not for purpose of delay and raises a substantial question of law or fact likely to result in reversal or an order for a new trial. If the judicial officer makes such findings, he shall order the release of the person in accordance with the provisions of section 3142(b) or (c).

"(c) Release or Detention Pending Appeal by the Government.—The judicial officer shall treat a defendant in a case in which an appeal has been taken by the United States pursuant to the provisions of section 3731 of this title, in accordance with the provisions of section 3142, unless the defendant is otherwise subject to a release or detention order.

"**3148. Sanctions for violation of a release condition**

"(a) Available Sanctions.—A person who has been released pursuant to the provisions of section 3142, and who has violated a condition of his release, is subject to a revocation of relese, an order of detention, and a prosecution for contempt of court.

"(b) Revocation of Release.—The attorney for the Government may initiate a proceeding for revocation of an order of release by filing a motion with the district court. A judicial officer may issue a warrant for the arrest of a person charged with violating a condition of release, and the person shall be brought before a judicial officer in the district in which his arrest was ordered for a proceeding in accordance with this section. To the extent practicable, a person charged with violating the condition of his release that he not commit a Federal, State, or local crime during the period of release shall be brought before the judicial officer who ordered the release and whose order is alleged to have been violated. The judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer—

"(1) finds that there is—

"(A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or

"(B) clear and convincing evidence that the person has violated any other condition of his release; and

"(2) finds that—

"(A) based on the factors set forth in section 3142(g), there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or

"(B) the person is unlikely to abide by any condition or combination of conditions of release.

If there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community. If the judicial officer finds that there are conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, and that the person will abide by such conditions, he shall treat the person in accordance with the provisions of section 3142 and may amend the conditions of release accordingly.

"(c) Prosecution for contempt.—The judge may commence a prosecution for contempt, pursuant to the provisions of section 401, if the person has violated a condition of his release.

APPENDIX B

1. *"Bail Reform," Hearings Before the Subcommittee on the Constitution of the Senate Judiciary Committee, 97th Cong., 1st Sess., Sept. 17 and Oct. 21, 1981 (Comm. Print 1982)*

a. *Statement of Sen. Lawton Chiles (Fl.) (p. 57)*

My State of Florida has become the national port of entry for a massive invasion of illicit drugs. It is now estimated that 70 percent of the cocaine, 80 percent of the marihuana, and 90 percent of the illegal quaaludes that come into this country come through Florida. Revenues for illegal drug trafficking in Florida run from $7 to $10 billion a year. Individual revenues from drug transactions, according to Attorney General Smith, run from between $250,000 to $500,000 each month. This is in Florida.

With these large amounts of cash readily available, it is no surprise that no matter how high bail is set, the drug smuggler who has been arrested will make bail. Furthermore, it is not surprising that the drug dealer who gets out on bail will never appear in court.

Put yourself in the shoes of the drug dealer who has been arrested. He has two options. He can either stay in jail until trial, or he can post bail, forfeit the bond, and take the financial loss.

For the vast majority of drug dealers, the first option is simply unacceptable. A trial and a conviction add up to the prospect of a long prison term. The second option, on the other hand, translates into no more than a temporary business loss.

The situation today bears this out. There are presently 2,900 drug dealers who have jumped bail across the country and are presently at large. These fugitives outnumber our Federal drug agents by over 50 percent.

In Florida, the problem is especially serious. The U.S. marshal for the southern district of Florida currently has 369 failure to appear cases, of which 90 percent are drug related.

b. *Study prepared by Pretrial Services Agency of the Administrative Office of the United States Courts on failure of drug defendants to appear in the Southern District of Florida (pp. 67, 70)*

[The report included the following graphs which reflected the data collected by the agency.]

Graph 1.

Percent of all defendants prosecuted who were charged with drug offenses.

1-Year Period
Ending June 30, 1979

1-Year Period
Ending June 30, 1980

**Failure to Appear**

The failure to appear rate for defendants who had bond set at a court appearance and were released was 12.9%. During the same time period the 10 Pretrial Services districts experienced failure to appear rates of 2.3% (less than 1/5 of the rate in the Southern District of Florida).

Graph 2.

Failures To Appear as a Percent
of All Cases Prosecuted in Miami
For the 2-Year Period (July 1, 1978 - June 30, 1980)

☐ TOTAL FAILURES TO APPEAR

▨ DRUG DEFENDANTS WHO FAILED TO APPEAR

c. *Statement of James C. Anders, representing National District Attorneys Association (p. 98)*

I have consulted with the Federal magistrates for the State of South Carolina, Charles Gambrell and William Catoe, both of whom have expressed strong support for the changes in the proposed statute that would allow consideration of danger to the community in the setting of bail bonds.

Both of them emphasize the futility and even danger of allowing certain offenders suspected of heavy drug trafficking to be released on surety bonds. The inevitable consequence of such a release is the disappearance of the defendant, even after having posted, in my State of South Carolina in one case recently, a half million dollar bond.

To these defendants, forfeiture of bond is simply regarded as a cost of doing business. I certainly would concur with Senator Chiles in his statement earlier with respect to the drug traffickers.

d. *Statement of Jeffrey Harris, Deputy Associate Attorney General, Justice Dept. (pp. 180, 181–82, 186)*

Statistically, the rate of failure to appear among federal defendants is quite low. Nonetheless, there is an indentifiable minority of defendants as to whom no form of conditional release is adequate to assure appearance.

. . . . .

Too often we have been surprised by the ability of defendants who are engaged in extremely lucrative criminal activity—particularly those who are major narcotics

traffickers—to meet extraordinarily high money bonds, and to willingly forfeit these bonds by fleeing the country. With respect to such defendants, the most stringent form of release recognized by the Bail Reform Act—money bond—is not sufficient to assure their appearance at trial. In such cases, the law should make it clear that an order of detention is appropriate.

.    .    .    .    .

Increasingly, federal prosecutors are faced with the problem of defendants, particularly those engaged in highly lucrative criminal activities, who forfeit large money bonds and flee prosecution. These defendants, who use the proceeds of their illegal activities to post bond or provide collateral for corporate surety bonds, view forfeiture of bond as just another cost of doing business. Indeed, it appears that there is a growing practice among those engaged in large scale criminal activities of setting aside a portion of the proceeds of crime to cover this "cost."

The rationale of the use of money bond as a form of conditional release is that the prospect of forfeiture of the bond can be a sufficient incentive to assure appearance. However, this rationale does not hold true where the proceeds of crime are used to finance the bond and forfeiture is in fact anticipated as the cost of avoiding prosecution.

e. *Statement of Bruce D. Beaudin, Director of D.C. Pretrial Services Agency (p. 217)*

Study after study demonstrates that the setting of a bail bond discriminates against the poor and that a simple promise to appear is as effective as the use of the bail bondsman in assuring appearance at trial. At the same time, it is clear that many who post bail (accused alien smugglers and narcotics traffickers, for example) can post even high bail, consider it a business expense, and fail to appear despite the substantial investment.

2. *"Bail Reform and Narcotics Cases," Hearing Before the Select Committee on Narcotics Abuse and Control, House of Representatives, 97th Cong., 1st Sess., July 22, 1981 (Comm. Print 1981)*

a. *Remarks of Chairman Zeferetti (p. 1)*

Figures compiled by the select committee show that in the 10 demonstration districts within the pretrial services agencies of the U.S. courts over the last 5 years, 53 percent of the bail violators still at large were originally charged with narcotics violations. Even more shocking is the fact that in the southern district of Florida, which includes Miami, the major entry point of drug traffickers, approximately 62 percent of the Federal defendants who failed to appear in court were charged with drug offenses.

These figures clearly confirm that major narcotics offenders cannot be considered safe bail risks. These offenders have the ability to place themselves beyond the reach of law enforcement officers, the ability to flaunt our judicial system, and the ability to continue their illegal trafficking alternatives.

b. *Statement of Francis M. Mullen, Acting Administrator, DEA (p. 19)*

... [A] preliminary random sampling study conducted in DEA indicates that a high number of defendants released on bail fail to appear before the court. These "failures to appear" occur at several stages of the criminal process: many suspects are charged, but not arrested (unexecuted warrants); the majority of "failure to appear" defendants are arrested, released on bail, but flee prior to trial; far lesser numbers flee after adjudication prior to sentencing or during pendency of appeal following sentencing. A preliminary, limited study conducted by the Administrative Office of the United States Courts showed that of the total number of defendants whose "failure to appear" cases were analyzed, 31

percent were charged with narcotics violations.

c. *Statement of Frederic N. Smalkin, U.S. Magistrate for the District of Maryland (p. 43)*

... [T]he statistics indicate that, at any one time, more than 50 percent of all federal fugitives (including both released defendants and those who have never been apprehended) are narcotics offenders. Thus, there is a basis for giving special attention to narcotics offenders, and a general revision of the bail laws, or a special provision relating to narcotics traffickers, if Congress is so inclined, could be of great value. Narcotics offenders, because of the huge amounts of money that are available to many of them, often view bail simply as a cost of continuing to do business or of fleeing prosecution. So long as the current scheme of bail release remains intact, it seems to me that this attitude is unlikely to change. In other words, I believe that judicial officers should be given more flexibility to prevent narcotics traffickers from further evading the processes of justice.

d. *Statement of Mr. Kenneth Feinberg (p. 95)*

If recent bail studies agree on any single conclusion it is that the bail system is most likely to break down in the area of narcotics enforcement and drug addiction. The ineffectiveness of existing bail procedures in dealing with the pervasive narcotics problem is proved by examining the type of person most likely to be arrested while on bail. Those rearrested usually have some relationship to narcotics trafficking or addiction. Although a convincing argument can be made that the rearrest rate of persons bailed is not serious enough to warrant a wholesale change in existing bail procedures, I think it is becoming increasingly obvious that, when it comes to narcotics, bail reform takes on an additional urgency.

I also believe that it is in the area of narcotics enforcement that one sees the most common abuses of the existing money bail system. The record is filled with examples of the influential narcotics dealer who posts the one million dollar bail set by the judge as a condition of release and then proceeds to flee the jurisdiction or continues to ply his trade. One can hardly point with pride to bail procedures which allow such highly publicized examples of the misuse of money bail.

e. *Statement of Mr. Joel Hirschhorn, on behalf of National Association of Criminal Defense Lawyers (p. 106)*

(Mr. Hirschhorn offered the following chart, based on data given him by Mr. Joseph Bogart, Clerk of the United States District Court for the Southern District of Florida.)

U.S. DISTRICT COURT—SOUTHERN DISTRICT OF FLORIDA

| Year | Total number of cases filed | Total number of narcotics cases filed | Total number of bond-jumping indictments | Percentage of bond-jumping indictments All cases | Narcotics cases |
|---|---|---|---|---|---|
| 1978 | 920 | 439 | 16 | 2 | 4 |
| 1979 | 576 | 209 | 9 | 2 | 4 |
| 1980 | 739 | 289 | 12 | 2 | 4 |
| Jan. 1, 1981, to June 30, 1981 | 352 | 168 | 16 | 5 | 10 |
| Total | 2,587 | 1,105 | 53 | 2 | 5 |