**UNITED STATES of America**

v.

**Jerry HUCKABAY, Defendant.**

**Crim. No. 88-00048-B.**

United States District Court,
D. Maine.

Feb. 7, 1989.

---

Thomas Goodwin, Asst. U.S. Atty., Bangor, Me., for plaintiff.

Julian Sweet, Lewiston, Me., for defendant.

## MEMORANDUM OF FINDINGS AND CONCLUSIONS ON GOVERNMENT'S MOTION FOR REVOCATION OF RELEASE ORDER

CYR, Chief Judge.

### I. *Nature of Proceeding*

The defendant was indicted December 20, 1988, on charges of conspiracy to possess, and possession, with intent to distribute, cocaine. On December 29, 1988, he moved to continue the hearing on the Government's motion for detention. The United States Magistrate found good cause for continuing the detention hearing in excess of five days, and hearing was held on January 10, 1989. On January 18, 1989, the Magistrate denied the motion for detention, concluding that "a combination of conditions can be imposed which will reasonably assure the appearance of the defendant as required." Order on Government's Motion for Detention, at 6 (D.Me. Jan. 18, 1989). Bail was set at $100,000, and special conditions were imposed. (*See* Appendix A.)

On January 20, 1989, the Government filed a motion for revocation of the Magistrate's release order, requesting that the defendant be detained pending prompt review. On the same day, the defendant appeared before the Magistrate for approval of the bail bond and the other prerequisites to release. The Magistrate concluded that "an appeal of the magistrate's release order after a motion for detention has been filed at the initial appearance, by statutory implication, authorizes the judicial officer to stay the release order to allow the court having original jurisdiction to pass upon the detention issue." Supplemental Order on Government's Motion for Detention, at 4 (D.Me. Jan. 23, 1989). Defendant moves for immediate release pending resolution of the motion for revocation, arguing that the Magistrate's release order remains in effect until revoked by the district court.

On January 25, 1989, hearing was held before the court on the motion for immediate release and on the motion for revocation of the release order.

### II. *Discussion*

The court's authority to review a magistrate's release order derives from 18 U.S.C. § 3145(a)(1), which states:

(a) Review of a release order.—If a person is ordered released by a magistrate, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court—

(1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion

for revocation of the order or amendment of the conditions of release.

The former version of section 3145, which was amended by the Comprehensive Crime Control Act of 1984, specifically permitted only the defendant to appeal a release order. *See* 18 U.S.C. § 3147 (1982) (repealed 1984). Later, section 3145 was amended to effectuate the "clear public interest in permitting review of release orders which may be insufficient to prevent a defendant from fleeing or committing further crimes." S.Rep. No. 98–225 (1983), reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3213. *See also United States v. Bayko*, 774 F.2d 516, 519 (1st Cir.1985). Although the Magistrate found no direct authority for detaining the defendant pending the section 3145 review, the Magistrate relied on this "clear public interest" in rejecting defendant's argument that the conditional release order remained in effect until modified on review. Supplemental Order on Government's Motion for Detention, at 3. *Cf. United States v. Geerts*, 629 F.Supp. 830, 831 n. 2 (E.D. Pa.1985) (district judge stays magistrate's release order pending disposition of motion for revocation).

### A. *Motion for Immediate Release*

█ The defendant argues that detention pending review of the conditional release order is not contemplated under the narrowly tailored pretrial detention provisions of 18 U.S.C. § 3142(d), (e) and (f); therefore, the present detention is illegal and unconstitutional.

Subsection 3142(f) states that "a continuance [of a detention hearing] on motion of the attorney for the Government may not exceed three days" and that a defendant may be detained during any such continuance and "pending completion of the hearing." 18 U.S.C. § 3142(f). The defendant contends that subsection 3142(f) is rendered meaningless if the government can obtain detention pending review of a release order issued after a detention hearing, thereby "extend[ing] the temporary detention indefinitely by the mere filing of a

Motion for Revocation." Memorandum in Support of Defendant Jerry D. Huckabay's Motion for Immediate Release, at 8.

Defendant's argument is overstated. First, Congress expressly identifies a clear public interest in permitting review of a magistrate's release order. Requiring release pending review by the district court could frustrate the very purpose of review. *See United States v. Bayko*, 774 F.2d at 519. Moreover, subsection 3145(a) mandates prompt review, thereby providing a reasonable safeguard against unduly extended detention during review. *See also United States v. Fernandez–Alfonso*, 813 F.2d 1571, 1572 (9th Cir.1987). Finally, subsection 3142(f) may be construed conformably with the important congressional aim of assuring meaningful review of release orders, inasmuch as subsection 3142(f) permits detention "pending completion of the [detention] hearing," which reasonably includes a limited period for prompt review of the magistrate's release order under subsection 3145(a). Certainly there is nothing in the statute or in its legislative history to suggest that Congress intended to deny the district court a reasonable opportunity to inform and exercise its discretion, which necessarily contemplates a hearing and/or *de novo* consideration of the record presented before the magistrate. *See United States v. Maull*, 773 F.2d 1479, 1481–82 (8th Cir.1985) (en banc).

### B. *Motion for Detention*

█ Under section 3145 the district court conducts *de novo* review of a magistrate's release order,[1] *see* 773 F.2d at 1481, and subsection 3145(a) requires prompt review, 18 U.S.C. § 3145(a). *Cf. United States v. Fernandez–Alfonso*, 813 F.2d at 1572 (35–day delay between filing of defendant's motion for review of detention order and resolution of the motion violates promptness requirement).

---

1. The court may conduct *de novo* review of a magistrate's release order on the stipulated record before the Magistrate, defendant's testimony and oral argument. *See United States v. Geerts*, 629 F.Supp. at 831.

The Government demands detention pursuant to 18 U.S.C. § 3142(a)(4) and (e). Subsection 3142(e) states in relevant part:

(e) Detention.—If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial....

. . . .

Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), section 1 of the Act of September 15, 1980 (21 U.S.C. 955a), or an offense under section 924(c) of title 18 of the United States Code.

The rebuttable presumption that no condition or combination of conditions of release reasonably can assure the appearance of the defendant and the safety of the community arises upon a judicial finding of probable cause to believe that the defendant committed one of the serious drug offenses criminalized by 21 U.S.C. §§ 801 *et seq.* In order to rebut the presumption, the defendant "... would only have to introduce a certain amount of evidence contrary to the presumed fact; no change in the burden of persuasion is effected." *United States v. Jessup,* 757 F.2d 378, 380–81 (1st Cir.1985).

Yet this rebuttable presumption is not of the "bursting bubble" variety, such that it is dispelled without a trace "once conflicting evidence has been presented" by the defendant. *Jessup,* 757 F.2d at 383. In order to effectuate the congressional intendment of the rebuttable presumption, the determination whether any condition or combination of conditions reasonably assures the appearance of the defendant and the safety of the community is to be made in light of the rationale of the rebuttable presumption—that of *requiring judicial recognition of the congressional "assessment of [the] probabilities," id.* (emphasis added), of *a heightened likelihood of pretrial flight* and danger to the community where there is probable cause to believe that the defendant has committed certain serious drug offenses, *see id.* at 384 (citing S.Rep. No. 225, 98th Cong., 1st Sess. 19, 20 (1983), reprinted in 1984 U.S.Code Cong. & Admin.News 3202, 3203). Even after rebuttal of the presumption, therefore, the courts are not free to *disregard* the congressional finding that certain serious criminal conduct, *generally speaking,* carries with it *"special* risks of flight," *id.* at 384 (original emphasis), and danger to the community. Although the legislative determination that persons indicted for certain serious drug offenses often pose special risks of flight and a danger to the community may be *overcome* by the other factors disclosed by the adjudicative factfinding conducted in a particular case, *id.,* the court must include that legislative determination, along with the other factors prescribed by subsection 3142(g), in any pretrial detention calculus implicating the rebuttable presumptions established by subsection 3142(e).

The defendant insists that the rebuttable presumption in subsection 3142(e) relates only to the likelihood of flight, and not to any likelihood of danger to the community. The explicit language of subsection 3142(e) clearly belies that contention.[2] Moreover,

---

2. The final paragraph of subsection 3142(e) states that "... it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required *and the safety of the community* if the judicial officer finds that there is probable cause...." 18 U.S.C. § 3142(e), Final ¶ (emphasis added). That this crystal clear language was not used inadvertently is readily demonstrated by comparing it with the *first* paragraph of subsection 3142(e): "If ... the judicial officer finds that no condition or combi-

the First Circuit has expressed itself on the point as well.[3]

Legislative history buttresses this view too. The rebuttable presumption that flight is more likely in serious drug cases is predicated in part on legislative determinations about "the extremely lucrative nature of drug trafficking, and the fact that drug traffickers often have established substantial ties outside the United States...." *Id.* at 385. The right contacts and large financial resources often are indispensable prerequisites, as well as strong inducements, to flight to avoid prosecution for serious drug offenses carrying lengthy prison terms.

The other factors to be considered in determining whether detention is warranted are set forth in subsection 3142(g).

. . . .

(g) Factors to be considered.—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(2)(K) or (c)(2)(L) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g) (Supp.1986). In deciding whether there are conditions of release which reasonably assure the appearance of an indicted defendant and the safety of the community, the court must consider all factors set forth in subsection 3142(g), *together with* the legislative assessment that these defendants often pose special risks of flight and danger to the community. *See* 18 U.S.C. § 3142(e); *Jessup,* 757 F.2d at

nation of conditions will reasonably assure the appearance of the person as required and the safety of *any other person* and the community, such judicial officer shall order the detention of the person before trial...." 18 U.S.C. § 3142(e), ¶ 1 (emphasis added). Congress chose in the final paragraph of subsection 3142(e) not to establish any presumption that there are no conditions of release which reasonably can assure the safety of *any other person,* while at the same time establishing a rebuttable presumption that no conditions of release reasonably can assure the appearance of the defendant *and* the *safety of the community.* A logical explanation for the establishment of a presumption relating to the safety of the *community,* but not to the safety of any particular *person,* would

seem to be that the latter, by its very nature, is more appropriately left exclusively to determination through the ad hoc adjudicative factfinding process, whereas risk to the safety of the *community* (e.g., from continued drug dealing), like the risk of flight, has been found amenable to legislative factfinding.

3. "... § 3142(e) creates ... the drug offender presumptions already mentioned (concerning 'flight' and 'danger').... " 757 F.2d at 381. Earlier in the opinion, Judge Breyer discusses the § 3142(e) presumptions of "flight" and "danger," and determines that only the former is directly involved in that case. *Id.* at 380.

384. If the court determines that detention is necessary, the detention order must comport with subsection 3142(i).[4]

The present indictment establishes probable cause that the defendant has committed two serious drug offenses punishable by more than ten years' imprisonment under 21 U.S.C. §§ 801 *et seq.,* raising the rebuttable presumption that there are no conditions which reasonably assure either the appearance of the defendant or the safety of the community. *See* 18 U.S.C. § 3142(e); *United States v. Vargas,* 804 F.2d 157, 161 (1st Cir.1986).

The defendant has represented that he would live with his girlfriend, Vicki Ladman, and obtain employment in Boise, Idaho. He has demonstrated an ability to tender $100,000 in cash to secure future appearances as required, and he has represented that he will comply with all of the conditions of release imposed by the Magistrate. *See* Appendix A. The court finds that the defendant has produced evidence sufficient to rebut the presumption that there are no conditions of release which would reasonably assure his appearance and the safety of the community.

## III. *FINDINGS*

The court has considered the following information relating to the factors to be taken into account pursuant to subsection 3142(g).

1. The indictment charges that the defendant sold approximately one kilogram of cocaine to co-defendant Katherine Wilson. The affidavit of DEA Special Agent Michael A. Cunniff attests that Wilson has admitted that, approximately twice a month for about two months preceding the defendant's arrest, she obtained from one to two kilograms of cocaine from the defendant, whom she described as her "Alaskan" supplier. Cunniff Aff., at ¶ 9. At the time of defendant's arrest he was carrying a suitcase containing one kilogram of a substance which field-tested as cocaine. *See id.,* at ¶ 3–6. Thus, the defendant is charged with two serious drug offenses, involving large quantities of cocaine. The weight of the evidence against him is very heavy. There is no evidence that the defendant has failed to appear for court proceedings. The defendant was not on parole, probation or release when arrested on the present charges.

2. Evidence as to the defendant's character, physical and mental condition, family ties, employment, ties to Maine, drug and alcohol use, criminal history, and financial resources has been gleaned from the December 29, 1988 Pretrial Services Report, an update of that report, defendant's hearing testimony and defendant's federal income tax returns for the years 1984 through 1987.

The defendant testified—and the Pretrial Services reports, both of which recommend detention, corroborate—that the defendant was born on April 18, 1945, in Wenatchee, Washington, and that he lived there until he and his mother moved to Boise, Idaho, while he was in his early teens. In 1965, defendant married his first wife, and they moved to the State of Washington. The defendant divorced his first wife in 1976, the marriage having produced two children. He remarried in 1976, and in 1981 he and

---

**4.** (i) Contents of detention order.—In a detention order issued under subsection (e) of this section, the judicial officer shall—

(1) include written findings of fact and a written statement of the reasons for the detention;

(2) direct that the person be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

(3) direct that the person be afforded reasonable opportunity for private consultation with counsel; and

(4) direct that, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the person is confined deliver the person to a United States marshal for the purpose of an appearance in connection with a court proceeding.

The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

18 U.S.C. § 3142(i) (Supp.1986).

his second wife moved to Anchorage, Alaska. After divorcing his second wife in 1984, defendant moved in with his present girlfriend, Vicki Ladman, in Boise, Idaho, in 1985. The defendant testified that he remains very close to his two children and his first wife, and he claims a close relationship with Ladman.

Although he testified that he presently resides with Ladman in Boise, Idaho, he testified that he continues to maintain a mailing address at a privately-operated mail cache in Anchorage, Alaska, which he uses purportedly for receiving forwarded mail when he travels to Alaska in connection with his construction work. Yet he states that he uses Ladman's residence in Boise as a mailing address also. He was unable to explain the need for the private mail cache in Anchorage, except to say that he goes there to pick up mail which has arrived there since his previous visit. Defendant's driver's license reflects the Anchorage address. During much of the summer of 1988, the defendant resided at a marina in Chelan, Washington, where his boat was moored. On the certificate of title to this boat, which the defendant purchased with $164,000 in cash in May 1988 and resold to a "close friend" in December of 1988, the defendant used an Oregon address of the same "close friend." The defendant testified that the boat has never been in Idaho and that he chose to register it in Oregon in part because Oregon does not have a sales tax, whereas Idaho does.

The defendant testified that he worked for Alcoa Aluminum in Washington between 1965 and 1973; from 1973 to 1979, as manager of an apartment complex and as a carpenter; from 1979 to 1981, at the Bonneville Power House in Stevenson, Washington, as foreman in the precast yard; and from 1981 to 1985, as a carpenter in Alaska. During the latter period, the defendant and his brother formed a partnership to operate video stores in Colorado. After managing one of the video stores with Ladman from 1986 to 1987, defendant sold the failing video business at a loss. Since 1987, defendant claims that he has been semi-retired, having been in a position to retire since about age 28, but that he

continued to remodel houses for friends in Alaska and that he spent three months in 1988 remodeling Ladman's Boise home.

Copies of defendant's federal tax returns for 1984 through 1987 reveal net income of $25,255 in 1984, but net losses in the next three years totalling $78,375. He testified to earning from $80,000 to $90,000 remodeling houses since 1987, excluding the uncompensated work he did for Ladman. The defendant estimates that he owes $20,000 in past-due federal income taxes.

The defendant declined to reveal the names of the individuals whose homes he claims to have remodeled in Alaska, because they were "friends" who paid him cash and asked that their names not be revealed. The defendant further testified that he has earned considerable income from real estate ventures, primarily apartments, since he was approximately 20 years of age. He presently receives about $400 per month from the sale of a house in Oregon two years ago, for $82,000. However, he testified that he did not place his money in banks, because he does not like banks. An exception was a relatively low-balance checking account in Alaska, which was closed out following its attachment by the Internal Revenue Service, with which defendant is currently engaged in a tax dispute.

Notwithstanding the losses reflected on his tax returns since 1985, and the absence of any credible evidence of significant income since 1987, or prior to 1984, the defendant paid $164,000 in cash for a 39–foot boat in May 1988. The defendant testified that he saved the cash used to purchase the boat over a long period of time, and that his earlier tax records (which he did not produce nor did he state that he still possessed) would reflect sufficient income to account for the accumulation of $164,000 in cash. He sold the boat in December 1988 for $100,000 to the same "close friend" whose address he used on the certificate of title. In further part payment for the boat, this "close friend" agreed to extinguish certain unidentified debts owed him by the defendant. The defendant owns several

motor vehicles, including a 1957 Corvette valued at $15,000.

The defendant's criminal history includes a 1966 assault conviction and a marijuana distribution *arrest* in 1983. As concerns the marijuana arrest, defendant testified that he was charged with possessing several pounds of marijuana, but that the charge was dismissed on the ground that evidence had been obtained by means of an illegal search and seizure. The defendant asserts that he drinks alcohol in moderation and that he does not use illegal drugs, though he admits to having experimented with illegal drugs in the past.

At the time of his arrest, the defendant was found in possession of at least four identification cards in names other than his own. The defendant described these as airline identification cards, obtained, either directly or through a ticket broker, from persons who resold their airline tickets at discount prices to avoid airline cancellation penalties. The defendant testified that these identification cards were necessary to enable him to use airline tickets issued in the names of the original purchasers. One of these pseudonymous airline identification cards bore a photo of the defendant, which defendant stated that he obtained after the airline refused to honor a ticket issued in another person's name. When asked why he retained these airline identification cards after using the particular tickets issued in the corresponding names, he said that it was because the same individuals might wish to sell another ticket. The defendant said that such a coincidence was not unlikely, because many people buy and resell airline tickets in order to accumulate frequent flyer mileage. The defendant volunteered that he has never checked into a motel under an assumed name.

The defendant testified that he has traveled to Maine on three or four occasions. His only Maine contact is his co-defendant, whom he met in Alaska, and who knew defendant as her "Alaskan" supplier of cocaine.

Defendant stated that, if released, he would stay with Ladman in Boise, Idaho, and that he would comply with the conditions set forth in the release order. He further stated that he considers himself a good carpenter and a "workaholic," and that he could find employment easily in Boise. There is no evidence that defendant was employed at the time of his arrest or that he has an actual job offer. The defendant represented that he is close to his daughter, who attends college in Idaho, and that he keeps in touch with his son, who is stationed at a U.S. Air Force base in Michigan. He states that he would maintain continued contact with his daughter.

## IV. *CONCLUSIONS*

In this case, rather than dispelling the continuing concern that there are special risks of flight and danger to the community, much of the specific evidence adduced at the detention hearing dovetails with those concerns.

The court finds that material portions of the defendant's testimony are not credible. The defendant testified that he did not keep money in banks (including at least $164,000 in cash used to buy the boat) because he dislikes banks; and that he would not reveal the names of individuals in Alaska from whom he says he earned $80,000 to $90,000 since 1987 doing remodeling work on their homes, because they had paid him in cash and had asked him not to reveal their identity. Defendant's attempt at explaining how he was able to afford a $164,000 boat after three consecutive years of substantial losses, and during a period in which he was being pressured by the IRS for past-due taxes, raises more questions than it answers. In the court's view, the defendant's testimony, together with other evidence, supports the reasonable inference that the defendant has been involved in large-scale illegal drug dealings for a considerable period of time.

The court further finds that defendant's explanation of his possession of several pseudonymous identification cards is less than convincing, particularly his statement that he retained these cards because he expected that some of the individuals whose cards he possessed would again have tickets for sale. But even if his ex-

planation is credited, his possession of false identification cards, and his admitted use of them, evidence the *means* and *readiness* to travel under false names affording him convenient "cover" should he decide to flee.

The risk of flight is increased by his use of numerous addresses. In particular, the defendant maintains a *private* mail cache in Alaska, despite his contention that he resides in Boise. Even his driver's license lists the Alaska address. Defendant's contention that he has strong ties to Boise, particularly to Vicki Ladman, is cast in doubt not only by the numerous addresses he has used since he has been staying with her, but also by evidence that he has traveled frequently to Maine and Alaska in the recent past; that he spent three months in the summer of 1988 on his boat in Washington; and that he was unemployed at the time of arrest and has no outstanding offer of employment. Defendant's mobility, ready access to large amounts of money, (e.g., co-defendant Wilson told DEA that, at the time of her arrest in this case, she owed defendant $78,000 for previous drug deliveries), lack of present employment, and the lack of any reliable evidence that he has been employed since 1987, increase the likelihood that the defendant would pose a danger to the community by engaging in illegal drug activities while released.

Finally, his explanation of the original source of the $100,000 in cash being tendered as collateral to secure his release is so suspect that the court, on its own motion, finds and directs that it may not be used as collateral because it will not reasonably assure either the defendant's appearance or the safety of the community. *See* 18 U.S.C. § 3142(g)(4). The rationale for the court's action in this regard is that the defendant's involvement in large-scale, lucrative drug trafficking provides a more plausible explanation of the original source of these large sums of cash than does defendant's own flawed explanation. Considering the scale of defendant's illegal drug activities, e.g., one customer alone owed defendant $78,000 for approximately four deliveries made within two months of his arrest, there is reason to believe that the ready availability of very large sums of money from past or future drug dealings (should he be released) would seriously diminish the effectiveness of the tendered cash bail of $100,000 as a deterrent to flight or to continued drug dealing.

Upon careful consideration of the factors prescribed by subsection 3142(g) and in light of the rationale of the rebuttable presumption under subsection 3142(e), the court finds that there are no conditions of release which reasonably assure either the appearance of the defendant or the safety of the community. Accordingly, the court has ordered that the defendant be detained pending trial. *See United States v. Huckabay,* No. 88–00048–B, Order of Detention (D.Me. Feb. 2, 1989).

## APPENDIX A

The order directed that:

1. The defendant shall not commit any offense in violation of federal, state or local law while on release in this case;

2. The defendant shall immediately advise the court, defense counsel and the U.S. Attorney in writing of any change in address and telephone number;

3. The defendant shall appear at all proceedings as required and shall surrender for service of any sentence imposed as directed;

4. The defendant shall be placed in the custody of Vicki Ladman who shall agree in writing, (a) to supervise the defendant in accordance with all conditions of release, (b) to use every effort to assure the appearance of the defendant at all scheduled court proceedings, (c) to notify the court immediately in the event the defendant violates any conditions of release or disappears, (d) to inform the court of her mailing address and telephone number, and (e) immediately inform the court of any change of address or telephone number;

5. The defendant shall:

(a) actively seek employment and maintain such employment;

(b) reside with Vicki Ladman in Boise, Idaho and not leave the State of Idaho except to travel to the State of Maine to

consult with his counsel or to appear in court; before leaving the State of Idaho the defendant shall inform his attorney of the scheduled date of his departure and his arrival in Maine and the place where he will be staying while in Maine;

(c) report on a regular basis to the Pretrial Services Office in Boise, Idaho at least three times each week at such times and in such manner as the Pretrial Services Officer may direct;

(d) refrain from possessing a firearm, destructive device, or other dangerous weapon;

(e) refrain from excessive use of alcohol, and any use or unlawful possession of a narcotic drug and other controlled substances defined in 21 U.S.C. § 802 unless prescribed by a licensed medical practitioner;

(f) execute a bail bond with solvent sureties in the amount of $100,000 or deposit cash in the amount of $100,000 to secure such bond. Prior to the acceptance of the bail bond the court shall, pursuant to 18 U.S.C. § 3142(g)(4), conduct an inquiry into the source of any property offered as collateral to secure the bond;

(g) surrender any passport to the Pretrial Services Office in Boise, Idaho;

(h) obtain no passport;

(i) surrender all identification cards in the names of other persons to the Pretrial Services Officer in Bangor, Maine and refrain from obtaining any identification document in any name other than his true name; and

(j) sign the acknowledgment set forth at the end of this order and promise to abide by all conditions of his release.