UNITED STATES of America,
Plaintiff,

v.

John David WARD, et. al., Defendant.

Nos. SA 99–0199M–002,
SA 99–0200M–002.

United States District Court,
C.D. California,
Southern Division.

July 1, 1999.

James Spertus, Asst. U.S. Atty., Los Angeles, CA, for plaintiff.

James D. Riddet, Stokke & Riddet, Santa Ana, CA, for defendant.

## MEMORANDUM OF FINDINGS AND ORDER: (1) VACATING ORDER FILED JUNE 16, 1999 SETTING CONDITIONS FOR RELEASE OF DEFENDANT COONES ON BAIL, AND (2) ORDERING DETENTION

EDWARDS, United States Magistrate Judge.

### 1. Proceedings.

On June 7, 1999, the United States ("the government") moved for detention of defendant Coones pending trial. On June 16, the magistrate judge filed the order attached hereto denying the motion and setting conditions for the release of Coones on bail. The order expressly provided that either side could move for reconsideration if new evidence was obtained that would bear on the propriety of the denial of detention or the conditions of release.

On June 22, the government filed a motion for reconsideration, and an evidentiary hearing was held on June 25, 1999. At the hearing, the government, represented by Assistant U.S. Attorney James Spertus, presented evidence and argued that because Coones was both a flight risk and a danger to the community and others, the bail order should be vacated and he should be detained. Coones, represented by James Riddet, Esq., also presented evidence and argued for a modification of the conditions of release set in the June 16 order. After the hearing, the motion was taken under submission. It is now ready for decision. Having now fully considered the record and the arguments of counsel, the Court finds, concludes, and orders as set forth below.

## 2. The government's contentions on reconsideration.

■ The government continues to allege that Coones is a flight risk, but the government's principal argument for detaining Coones is that he is dangerous. Before a defendant can be detained based on his alleged danger, *i.e.*, as preventive detention, the facts upon which the Court relies must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f). Whatever facts are so-supported, the Court may then order detention only if it concludes that, because of those facts, "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *Id.* The government contends that it has made the requisite showing to warrant detention.

## 3. The government met its burden.

Neither the statute, 18 U.S.C. § 3142(f), nor case law defines how much assurance is required to "reasonably" assure that, if released, a defendant will not endanger anyone. There are several ways that a defendant can be a safety risk: he may

continue to commit crimes of the type alleged in the complaint for which probable cause has already been found; he may pose a threat to other persons, such as witnesses, to obstruct justice before or during his trial; or he may decide not to appear for trial and violently resist recapture.

■ The potential for Coones to continue in the criminal conduct alleged in the complaints [1] was addressed in the June 16 order, and no significant evidence has been presented affecting the analysis of risk discussed in the order. Coones' role in the drug conspiracy count in which he is charged appears to be that of a supplier of ephedrine used for manufacturing methamphetamine. More specifically, he appears to have connections with a major supplier of ephedrine and is involved in the chain of manufacture of the drug. There is no evidence at all, however, that he is situated to carry on the illicit business without major assistance by other members of the conspiracy, most of whom appear to have already been arrested pursuant to the same complaints in which Coones was charged. The likelihood that he is capable of continuing in the criminal activities under the glare of publicity he has received in this case seems slight.

Moreover, the conditions set for Coones' release included restriction to his house, with electronic monitoring to discover his absence if he failed to stay there. To the extent that the government needs assurance that Coones will not even make telephone calls to attempt to renew threatening associations and activities, the magistrate judge would consider still an additional condition of release: that Coones submit to the installation of a pen register and trap and trace device on all telephones to which he would have access from his home. It is doubtful that keeping Coones in custody until his trial is over would give significantly greater as-

---

1. Coones was indicted after the June 14 hearing; however, it has not been urged that the probable cause found by the Grand Jury changes the degree of risk from that assumed from the probable cause found in the complaints.

surances that Coones will not continue in the conspiratorial activities alleged in the complaints. Accordingly, the magistrate judge concludes that a combination of conditions can be set that will reasonably assure that Coones will not engage in the criminal conduct alleged in the complaints if he is released on bail.

The other kind of threat to safety, the threat that Coones will threaten the physical safety of others if he is released, raises different considerations. Little planning, or assistance of other conspirators, would be required for Coones to commit acts of physical violence or intimidation. Nor would a mere order restricting him to his home prevent him from leaving long enough to engage in acts posing this kind of danger to others. Given that, according to the government, Coones is facing a probable life sentence if convicted, he has substantial incentive to ignore a court order if he could engage in acts that would enhance his prospects of eventual acquittal. He may also, if inclined to acts of violence, elect to escape and violently resist recapture, if he concludes that a life sentence is likely.

 There is no presumption that every defendant facing a possible life sentence will commit acts or threats of violence to escape or avoid trial. On the contrary, as noted in the June 16 order, the presumption is that all defendants in non-capital cases should be released on bail pending trial. Each defendant must be released unless the various factors in his own background and conduct indicate that the risk is too great. The government contends that Coones is not an ordinary defendant, but that he is a violent person and that there are no conditions the Court can set that will reasonably assure the safety of witnesses or others if he is released. The issue therefore is whether the government has shown by clear and convincing evidence the existence of facts from which the Court must conclude that there is no condition or combination of conditions that will give reasonable assurance that Coones

will not commit acts or threats of violence, or otherwise threaten the safety of others if released.

The government presented "clear" evidence, so the first question is whether it was "convincing" evidence establishing the fact of Coones' willingness to threaten the safety of others, if released. The evidence on both sides is mixed. A number of witnesses for Coones testified that he is a gentle person who has never been known to lose his temper or engage in any act of violence. However, some of these witnesses were felons whose standards of acceptable conduct may be reasonably questioned. One defense witness asserted his 5th Amendment right against compulsory self-incrimination under cross-examination by the prosecutor, and the witness' credibility was not fully convincing (or adequately tested). Others were shown not to have known Coones as well as they believed they did. Coones' threats of violence on the wiretap tape described in the June 16 order, although possibly an isolated event, was also suggestive of a completely different personality than that known to the defense witnesses. This was also evidenced by the testimony of Special Agent Darrin Kozlowski of A.T.F. that he learned while working in an undercover capacity that defendant had participated in the beating of a member of the San Fernando Valley Chapter of the Hells Angels. Although the information came to the agent from a victim whose credibility is unknown, Agent Kozlowski has 9 years of undercover experience, and he credited the information as accurate.

The government also produced a file found in a search of defendant's residence that contained a collection of alleged "informants" and "infiltrators," apparently kept by defendant in his capacity as president of the Orange County Chapter of the Hells Angels. In addition, the government produced an affidavit for a 1991 search warrant showing that Coones once took pictures of an informant and "had him/her checked out." He was able to discover

where the informant lived and showed up at the informant's residence with another man who displayed a handgun to the informant. Although the information came from an unidentified informant, the affiant who sought the search warrant was a law enforcement officer of several years experience who showed that the informant had been tested in other cases and had produced credible information.

Special Agent McKinley of the F.B.I. also testified for the government at the June 25, 1999 hearing. McKinley has spent at least 18 years studying outlaw motorcycle gangs, and he includes the Hells Angels, of which Coones is the president of the Orange County Chapter, as such a gang. McKinley's expertise may not rise to the level required to satisfy the requirements for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), but he did demonstrate that he had acquired a great deal of knowledge about the Hells Angels that is useful herein, and admissibility under the Federal Rules of Evidence is not required in these proceedings. Rule 1101(d)(3), Fed.R.Evid. McKinley's testimony was plainly that of an advocate for the government's position, not that of an impartial expert; however, there was nothing to suggest that his answers to questions were not honest and correct to the best of his knowledge.

Special Agent McKinley testified, in essence, that the leadership of the Hells Angels were self-described outlaws, although many regular members were law-abiding people. The economic lifestyles of the "movers and shakers," *i.e.*, the leadership of the Hells Angels, according to McKinley, were more expensive than could be accounted for by any legal income they had. Put another way, they get their incomes largely from crime, such as extortion and dealing in drugs, according to McKinley.

While the government disavowed any reliance on the "character" of the Hells Angels itself to support the government's contentions about Coones himself, the government legitimately relied on the characteristics of the entity and its leadership to argue that the organization would be put to Coones' use to help him avoid recapture, if he sought to escape, or to assist him in obtaining release on bail without regard to whether he would abide by the conditions of his release. More significantly, however, the government relied on McKinley's testimony to show that Coones wore a patch—an emblem on his clothing—showing that he was a dangerous killer. This was based on pictures of Coones that the government introduced into evidence at the hearing.

Coones' pictures showed him wearing a patch on his vest with the words "filthy few" and a pair of lightning bolts between the words. According to Special Agent McKinley, the only Hells Angels members who wear that patch are those who have killed someone in furtherance of the organization's aims. Some number approaching 100 of the patches are worn by Hells Angels members.

McKinley's testimony was not totally convincing. He was unable to give the magistrate judge more than sketchy reason to believe that any member with a patch was actually guilty of killing anyone. Apparently, none has ever been charged and convicted. If there were actually anywhere near 100 killings, it seems implausible that successful avoidance of detection by the perpetrators would have been so universal.

Defense witnesses, who were members or prospective members of the Hells Angels, testified that the patch in question was issued to everyone who rode in certain motorcycle events. The defense witnesses were not entirely credible, however, for various reasons discussed below. There may be also some question as to whether the witnesses were describing the same patch, since there are alternative versions of the patch that do not contain the lightning bolts (and do not signify that the wearer has killed anyone).

On cross-examination of Special Agent McKinley, defense counsel asked how the agent learned of the meaning of the patch. McKinley testified, essentially, that 3 different Hells Angels informants told him the same thing, and McKinley himself had worked in an undercover capacity to learn about outlaw gang activities and organizational structures, and the like. None of the statements of the informants were, however, reduced to writing or reported in writing by McKinley. One informant testified that he himself had killed someone and acquired a patch, but McKinley did not report the killing to anyone else at the F.B.I., at least not in writing.

Although McKinley did not specifically explain why he did not report an apparent murder, government counsel explained, in argument, that the informant wasn't what McKinley's investigation had been about. This is an implausible explanation, and it seems unlikely that an agent of the F.B.I. would ignore such a confession, if he believed it had any substance. It seems more probable that McKinley, at that time, viewed it as empty boasting. Either way, it does little to support the validity of the expert testimony as to the meaning of the patch.[2] Nonetheless, McKinley obtained apparently identical information from all 3 sources; he now believes it to be reliable; and the information cannot be ignored.

More importantly, it is clear that the F.B.I. as an institution accepts the view of the patch testified to by McKinley—that it signifies that the wearer killed for the Hells Angels. In fact, for many years, the F.B.I. has hosted seminars or provided lecturers at seminars for law enforcement officers where the meaning of the patch was taught as an accepted fact. While this does not prove the truth of the matter taught beyond a reasonable doubt—conventional wisdom can be utterly false—it does reflect the F.B.I.'s confidence in the validity of the information, which is entitled to substantial weight.

Considering all the foregoing, the magistrate judge accepts the opinion of Special Agent McKinley as true, at least to the extent that it supports a finding that a wearer of the lightning bolt "filthy few" patch has either committed a killing or has performed acts sufficient for insiders in the Hells Angels to believe that he has done so.

Given this finding, the conclusion that follows logically is that, if released on bail, defendant would pose a threat to those who may be witnesses or otherwise involved in the prosecution's efforts to obtain a conviction that may result in a life sentence. Alternatively, the defendant may pose a threat to those who would have the task of recapturing him if he chose not to appear for trial.

As previously noted, neither statutory law nor case law is instructive on the question of how much assurance is required to "reasonably" assure that, if released, a defendant will not endanger anyone. It is probable that defendant will stay with his family and not even threaten, much less actually harm, anyone pending his trial. That, however, is obviously insufficient assurance. Every person who participates in the trial, whether as a witness, a juror, or other participant, should be able to feel free of any concern that the defendant will be a threat to the participant's safety throughout the proceedings, so that each participant can focus on fulfilling his or her role in seeing that justice is done. This freedom from concern for safety should not disappear when the participant leaves the courthouse between sessions of the trial.

On the other hand, detention is not a tool to protect against every paranoid feeling a participant in a trial may experience. Rather, the magistrate judge interprets the law to mean that conditions of release on bail "reasonably assure" the safety of participants when the conditions are sufficient to enable reasonable persons to feel

---

**2.** There was also no information presented as to precisely who issued or awarded the patch or how they verified that the awardee was not simply boasting.

no more threatened than they would feel in cases where the law does not recognize a need for and does not provide for preventive detention. For example, the law does not provide for preventive detention in civil litigation. People may be apprehensive in emotionally charged civil litigation; however, people accept such apprehension as "reasonable" in our society. Ordinarily, the maximum available protection for a civil litigant's safety would be a restraining order against a threatening person—the functional equivalent of requiring the defendant in a criminal case to stay away from a witness, as a condition of release on bail.

Viewed in this light, defendant Coones' prior felony conviction in 1983, even coupled with his recent outburst in the telephone threat taped in the wiretap discussed in the June 16 order, would not be sufficient, standing alone, to warrant detention. However, these instances of conduct, combined with all the additional information discussed above, including the knowledge that the F.B.I. has concluded that the patch Coones wears shows that he holds himself out as one who has killed for the Hells Angels, warrants a different result. Given knowledge of all this information, a reasonable participant in defendant's trial would be far more apprehensive than he or she would be in even the most threatening civil litigation. The tape recording of defendant screaming obscenities at a man apparently resulted only from the man's failure to get some paperwork from someone after a business transaction. A juror, witness, or other trial participant in the present case might reasonably infer that Coones would have considered it worthy of more than a verbal tirade if the man had been involved in attempting to convict Coones of the serious criminal charge he now faces.

Moreover, based on the additional testimony at the June 25 hearing, the magistrate judge is not confident that defendant's proposed sureties will truly function as sureties, i.e., give reliable assurances that defendant will comply with any required conditions of his release. The proposed surety Sims, who offered almost half the value of the property to be posted pursuant to the June 16 order, no longer appears to be a fully reliable surety. He appeared not fully forthcoming when the prosecutor inquired about his dealings with John Ward, one of Coones' co-defendants in this case. Moreover, Sims specifically declined to sign a bond that would encumber him personally, i.e., beyond encumbering the equity in his house. While he presented business reasons for taking this position, he nonetheless lessened the significance of his vouching for Coones' reliability.

Another proposed surety, John Pagnani, was shown on cross-examination to have a much more extensive criminal record than the magistrate judge realized when the June 16 order was filed. While Pagnani did not testify falsely about his criminal record at the first detention hearing on June 14, the difference in the characterization of his background at the June 25 hearing significantly impacted and lessened the probative value of his assurances that defendant would not be a flight risk or safety risk if released on bail.

Scott Karnes, who testified at the June 14 hearing—and on whom the magistrate judge relied in part in denying the government's motion for detention—withdrew his offer to act as surety.

Some of the proposed sureties gave other reasons to doubt that their offers to post part of defendant's bail were based on any real confidence that he would comply with conditions of his release. Hells Angels members, for example, exhibited attitudes that renders it somewhat questionable whether they have actually given thought to whether defendant would either appear for trial or pose a threat while out on bond. They exhibited an attitude that might be characterized as more analogous to one offering a religious title than one offering assurance of defendant's reliability. That is, they seemed to take it for granted that they would never see their bail contribution again or have it returned to them, but that donating it was what was

expected of them as members of the group.

Somewhat disturbingly, it was also apparent from the numerous exhibits and testimony presented at the June 25 hearing that the Hells Angels members take it for granted that other members will be in trouble with the law at frequent intervals, which impacts the weight that can be given to their assurances that they trust defendant, a leader in the organization, to be law-abiding and responsible. One local member, for example, acknowledged that the leaders regularly require members to pay increased dues to defend against legal claims, but he exhibited an attitude that showed either that he was not even aware of what the money was spent on or that it didn't matter.[3] Pledges of the Hells Angels' clubhouses from the San Bernardino or Oakland chapters, presumably paid for by the rank-and-file membership, likewise offer little assurance that the members themselves know Coones and can vouch for his reliability.

To summarize, the totality of evidence presented at both hearings in this case is sufficient to carry the government's burden of showing that detention is required. The evidence presented, together with the reduced credibility of the defense's proposed sureties, convinces the magistrate judge that there is no condition or combination of conditions of release that can be set that will reasonably assure the appearance of the defendant at future proceedings and the safety of others.

In making this finding, the magistrate judge is mindful that the impact on defendant could be great. Defense counsel estimates that it will be 2000 before this case

is likely to be ready for trial. Defendant will continue to be denied his freedom, although he has been convicted of nothing. Moreover, this finding is not based on any determinations made beyond a reasonable doubt. It is not made even on a determination that defendant will "probably" flee or will "probably" pose a danger; it is based on much lower standards of what constitutes "reasonable assurance." Although no definition has been found for this term, either as it applies to the risk of flight or to the risk to the safety of others, the magistrate judge believes that the definitions and standards described herein are consistent with the statutory intent. Applying those definitions and standards to the facts compels the conclusion that the government's motion for detention must be granted.

## 4. Order.

Based on the forgoing, it is ORDERED that the order filed June 16, 1999 denying the government's motion for detention and setting conditions for release of defendant Coones on bail is VACATED, and defendant Coones is ORDERED DETAINED in the custody of the United States Marshal pending trial.

### ATTACHMENT

### MEMORANDUM OF FINDINGS AND ORDER DENYING MOTION FOR DETENTION AND SETTING CONDITIONS FOR RELEASE OF DEFENDANT COONES ON BAIL

## 1. Proceedings.

On June 14, 1999, the parties United States of America ("the government") and

---

**3.** On the other hand, the government's continuing argument that, if released, Coones will have "vast" monetary resources at his disposal to facilitate his escape is unsupported to the extent that the government is alluding to the resources of the Hells Angels. A member (from the San Bernardino chapter) who testified about his dues increase stated that the increase was about $5 per week. Given that there appear to be fewer than 30 members in the San Bernardino and Orange County chapters combined, it appears that

Coones' local support would, if unanimous, provide perhaps $150 per week. Given that there was testimony about rival factions in the Hells Angels, it seems unlikely that unanimity could be expected or that Coones could expect to live lavishly on any contributions made by the membership. To the extent that the government is alluding to support from non-members, it is on firmer ground. The major offer of surety value so far has been from a non-member.

defendant Howard Irving Coones[1] (the second named defendant on each of the above criminal complaints) came before Magistrate Judge Edwards for hearing on the motion of the government for detention pursuant to 18 U.S.C. § 3142.[2] The government was represented by AUSA James Spertus. Defendant appeared in person and was represented by James Riddet. After taking testimony, receiving evidence, and hearing arguments of counsel, the magistrate judge tentatively denied the motion for detention and advised the parties that a written order would be filed addressing the motion and setting conditions of release. Having now fully considered the record and the arguments of counsel, the Court finds, concludes, and orders as set forth below.

## 2. The Complaints.

The affidavits accompanying the two complaints herein are identical. Coones is charged in case number SA 99–0199M with conspiring to manufacture, distribute, and possess with intent to distribute, more than a kilogram of a substance containing methamphetamine. In case number SA 99–0200M, he is charged with conspiring to distribute and possess with intent to distribute more than 5 kilograms of a substance containing cocaine. Coones does not challenge the adequacy of the evidence in the affidavits to show probable cause to believe he committed the offenses charged. Nonetheless, the magistrate judge has reviewed the affidavits and concludes that they do support a finding of probable cause in each case.

1. The complaint reflects defendant's name as "Howard Irvine Coones;" however, defendant's counsel noted at the hearing that the correct name is "Howard Irving Coones."

2. The file in each case shows that Coones was arrested on June 6, 1999 at 6:00 a.m. and appeared before Magistrate Judge Nakazato on June 7 for initial proceedings pursuant to Rule 5, F.R.Crim.P. The government moved

## 3. Applicable Legal Standards.

There are two bases upon which the Court may order detention of a defendant prior to trial: that the defendant is a flight risk and that he poses a danger to any person or to the community if released. 18 U.S.C. § 3142(e). In this case, the government made four claims entitling it to a detention hearing under 18 U.S.C. § 3142(f), namely, that Coones is facing a life sentence if convicted, that he is charged with offenses under Title 21, United States Code, for which the maximum potential sentence is 10 years or more, that he is a serious flight risk, and that there is a serious risk that he would obstruct or attempt to obstruct justice, threaten, injure, or intimidate a witness or juror, or attempt to do so, if released.

The Court can order detention based on a defendant's alleged danger to any person or to the community only if the facts upon which the Court relies are supported by *clear and convincing evidence.* 18 U.S.C. § 3142(f). (Emphasis added.) However, the Court can order detention based on a risk that the defendant will flee, if the government meets a lesser burden, namely, if it shows by a *preponderance of the evidence* that there are no conditions of release that the Court can set that will reasonably assure that the defendant will make future court appearances. *United States v. Amir Masoud Motamedi,* 767 F.2d 1403 (9th Cir.1985). In either case, the evidence relied on does not have to be admissible under the Federal Rules of Evidence, and the Court can consider proffers of evidence by counsel. *Id.;* See also, Fed.R.Evid. 1101(d)(3); *U.S. v. Cardenas,* 784 F.2d 937, *vacated as moot,* 792 F.2d 906 (9th Cir.1986).

that Coones be detained in custody in each case. Coones was remanded into the custody of the U.S. Marshal, pending the hearing on the government's motion. The hearing on the motion was first continued to June 11, but on that date Judge Nakazato continued the hearing to June 14 at 2:00 p.m. before Magistrate Judge Edwards.

It is not disputed that, if convicted, Coones will face a sentence of a maximum term of greater than 10 years, pursuant to the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* Accordingly, there is a rebuttable presumption that no condition or combination of conditions of release will reasonably assure his appearance as required at future court proceedings or will reasonably assure the safety of the community. 18 U.S.C. § 3142(e).

### 4. Coones rebutted the Title 21 presumption at the detention hearing.

At the detention hearing, Coones called a range of witnesses who expressed confidence that he would not flee if released on bail. None of the witnesses had ever known Coones to be dangerous. Collectively, the witnesses, together with potential sureties who were not present, offered to post property worth a total of nearly $2,000,000 for Coones' bail.

Preliminarily, it was noted that Coones is the leader of the Orange County chapter of the Hells Angels. There was testimony that there were fewer than 20 members here, and two members testified for Coones. Each admitted to having been convicted of a felony, which the magistrate judge considered in assessing their credibility; however, the government specifically disclaimed any reliance on the reputation of the Hells Angels as any part of its contention that Coones is a flight risk or that he would pose a danger to the community if released. The government did rely on Coones' relationship with the Hells Angels, however, to argue that the witnesses would be biased in Coones' favor in view of their mutual affiliation with Hells Angels.

Billy Aguilar testified for Coones and offered to post property having an equity of about $70,000. He is a retired county employee and has known Coones for about 10 years.

Guy Castiglione testified that he is a property manager and has known Coones for about 5–6 years. He offered to post property having an equity of about $300,-000.

Johnny Pagnini testified and offered to post two pieces of property whose equity value totals about $235,000. He has known Coones for 12–13 years.

Daniel Roberts testified and offered to post property having an equity value of about $80,000. He is in the business of buying and selling motorcycles and has known Coones for about one and one-half years.

Kathryn Ornelas testified and offered to post her condominium worth about $28,000 in equity. She is Coones' girlfriend and has known him for about 12 years. She is employed as a restaurant manager in Orange County.

Ruth Davis testified and offered to post savings in the amount of $12,000. She is a nurse who has known Coones for about eight years.

Scott Karnes testified and offered to post two pieces of property in which his equity totals about $120,000. He is Coones' next-door neighbor and is seeking to become a member of Hells Angels.

In addition to the offers of the above witnesses, Pretrial Services received by fax an offer from a member of the Oakland, California chapter of Hells Angels indicating that it would post two properties valued at a total equity of about $210,000.

Also, a Ron Simms, of Bay Area Custom Cycles, faxed a commitment to Pretrial Services offering to post his home, which has an equity of about $1,100,000. Simms has known Coones for 15 years as a "close and personal friend."

Finally, defense counsel proffered that Ron Berryman would post property having an equity value of $30,000. Berryman is a computer technician who has known Coones for six years.

The government impeached all or substantially all of the witnesses who testified by asking if, in forming their expressed opinions that Coones was not a flight risk, they were aware that he had engaged in certain of the acts shown in the criminal complaints herein. None admitted to being previously aware of the acts, some expressed doubt that Coones did the acts alleged, but none indicated that it would affect their confidence that Coones would not violate conditions of release if released on bail. All were clearly informed that if they posted property or signed bonds promising to pay and Coones violated conditions of release, they would lose their property. The magistrate judge also warned all present in the courtroom that if they signed an affidavit of surety for an amount greater than the value of the property and Coones violated a condition of release, the government could hound them for 20 years to get what they owed. None expressed any change in intent to sign affidavits of surety and post property if bail was set.

The foregoing testimony was far in excess of the normal showing that defendants are able to present from people who know them. Given that the people who know Coones best do not believe that he will violate the conditions of his release, and given that they are willing to risk their valuable assets in support of their beliefs, it is clear that Coones has at least rebutted the statutory presumption under Title 21 and 18 U.S.C. § 3142(e).

The mere rebuttal of the Title 21 presumption does not entitle Coones to release; it simply does not bar release if the magistrate judge finds that there are conditions that can be set that will give reasonable assurance that Coones will not flee and will not pose a danger to the community. The 9th Circuit has not defined the precise nature of the Title 21 presumption. The leading case addressing it, which has been substantially followed by the other circuits who have addressed the question,

is *United States of America v. Mark Jessup*, 757 F.2d 378 (1st Cir.1985.) In *Jessup*, the opinion by Circuit Judge (now Justice) Breyer concluded that the Title 21 presumption does not shift the burden of persuasion to a defendant to prove that he is not a risk; nor is the presumption a "bursting bubble" type that disappears when rebutted. Rather, it is an intermediate type of presumption that the Court must keep in mind, but not give controlling weight to, after it is rebutted. Specifically, Judge Breyer stated:

> [T]he Act's history suggests a relatively obvious way to apply this presumption along the lines of the House Judiciary Committee's "intermediate position"— giving it some weight, without shifting the burden of persuasion. Congress investigated a general problem, the problem of drug offenders and flight. After hearing evidence, Congress concluded that "flight to avoid prosecution is particularly high among persons charged with major drug offenses." S.Rep., supra, at 20, 1984 U.S.Code Cong. & Admin.News, p. 23. It found that "drug traffickers often have established ties outside the United States ... [and] have both the resources and foreign contacts to escape to other countries...." Id. Congress then wrote its drug offender/flight presumption. These facts suggest that Congress intended magistrates and judges, who typically focus only upon the particular cases before them, to take account of the more general facts that Congress found. In order to "rebut" the presumption, the defendant must produce some evidence; and the magistrate or judge should then still keep in mind the fact that Congress has found that offenders, as a general rule, pose special risks of flight. The magistrate or judge should incorporate that fact and finding among the other special factors that Congress has told him to weigh when making his bail decision. See [18 U.S.C.] § 3142(g) (judicial officer shall weigh, among other things, "nature of circumstances of offense,"

"weight of evidence," "history and characteristics of the person including ... character, physical and mental condition, family history ..., past conduct ...," and so forth). Congress did not precisely describe just how a magistrate will weigh the presumption, along with (or against) other § 3142(g) factors. But the same can be said of each of the several § 3142(g) factors. It is not unusual for Congress to instruct a magistrate or judge conscientiously to weigh several different factors without specifying precise weights for each.

*(United States of America v. Mark Jessup,* 757 F.2d at 384.)

With the foregoing in mind, the magistrate judge has carefully considered both the government's and defendant Coones' contentions.

**5. Conditions can be set for Coones' release that will reasonably assure his appearance at future court proceedings and the safety of the community.**

In deciding whether a defendant's release creates an unacceptable risk that he will flee or that he will be a danger to any person or to the community, Congress instructs the Court to consider the nature and circumstances of the offense charged, the weight of the evidence against the defendant, and the defendant's history and personal characteristics (such as his character, physical and mental condition, family ties, employment, financial resources, length of residence, ties to the community, past conduct, and criminal history). 18 U.S.C. § 3142(g). Of these factors, the law requires that the strength of the government's present case against the defendant is to be given the least weight. (This is, in part, to avoid any temptation to "convict" a defendant at his bail hearing before he has had a trial.) *United States v. Amir Masoud Motamedi,* 767 F.2d 1403 (9th Cir.1985).

There are two clearly evidenced facts—beyond the facts of Coones' involvement in the present offenses—that the government relies on to show that he will be a danger to the community. The first is that in 1983 Coones was convicted of a felony. The underlying facts about the conviction are not of record; however, a records check by Pretrial Services shows that the charges were for possession of a narcotic controlled substance for sale and "transport/sell/narcotic controlled substance." The recorded disposition of the charges is not completely consistent with the charges and states in addition to the foregoing: "Possess/Etc. Machine Gun, 2 years prison. Potential felony strike entry."

The second fact the government relies on to show Coones' dangerousness pertains to the contents of a tape recording from a wiretap of one of his conversations made while this case was being investigated. The tape was played in court, and, for purposes of the hearing, it was accepted as authentic. It consisted, in large part, of Coones' voice screaming obscenities at a man on the telephone. Apparently, the man had been instructed by Coones to get some paperwork from someone in Nevada on a business transaction, and he had not done so—or had not obtained proper documentation. Coones repeatedly interrupted the man's attempts to explain and screamed angrily that the next time Coones saw him, Coones would "knock [him] out." The man tried throughout the conversation to explain in a civil tone, but Coones continued to scream obscenities and finally terminated the conversation (which, to the magistrate judge's recollection, appeared to last 2 or 3 minutes without any significant pauses).

The government contends that the apparent conviction involving the possession of a machine gun and the screaming threat over the telephone renders Coones such a danger that no conditions can be set that will reasonably assure that he will not endanger any person or the community, if he is released. The magistrate judge dis-

agrees and concludes that the conditions described below will provide such reasonable assurances as the law requires.

In drawing this conclusion, the magistrate judge considered that to "reasonably assure" the safety of the community does not require that the conditions of release eliminate every possibility that Coones will be a danger if released. Such assurance would never be possible, and, by that standard, all defendants in all cases would have to be detained from the time they were first arrested until they were tried and either acquitted or convicted.

The use of preventive detention—jailing a person before he is convicted, simply on the belief that he is a risk—is a recent innovation. It was of questionable constitutionality until very recent times. As the 9th Circuit stated in *Motamedi:*

> [F]ederal law has traditionally provided that a person arrested for a noncapital offense shall be admitted to bail. *Stack v. Boyle,* 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed. 3 (1951); *United States v. Honeyman,* 470 F.2d 473, 474 (9th Cir.1972). Only in rare circumstances should release be denied. [citations omitted.] Doubts regarding the propriety of release should be resolved in favor of the defendant. *Herzog v. United States,* 75 S.Ct. 349, 351, 99 L.Ed. 1299 (1955) (Douglas, J., in chambers); *United States v. McGill,* 604 F.2d 1252, 1255 (9th Cir.1979), cert. denied, 444 U.S. 1035, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980).

*(United States v. Amir Masoud Motamedi,* 767 F.2d at 1405.)

Here, the defendant was convicted of an offense 16 years ago, apparently for possession or transportation or sale of narcotics and for possession of a machine gun. He has had no record of any subsequent contacts with the law, much less any convictions, until the present charges were filed. The probative value of the 16 year old conviction is not nil, but it does not purport to show any propensity for violence. Nor does it suggest such a high risk that defendant will endanger the public by continuing to deal in drugs that the Court cannot impose any conditions to alleviate the risk.

As to Coones' screaming of obscenities and threats over the telephone, that one incident is contrasted against the universal acclaim of his many character witnesses that he is a non-violent person. If such a single incident of display of temper were sufficient to require detention of an accused, it is doubtful that many would ever be released on bail. Moreover, there are two additional factors that counsel against giving too much weight to the taped telephone conversation. First, defense counsel proffered that he had spoken to the man who was threatened, and the man denied ever actually feeling threatened—because he did not consider Coones violent. In fact, he stated, according to the proffer, that the next time he saw Coones, Coones was friendly and did not mention the subject.

Also, at the hearing, a lawyer, Louis Raring, testified that he was a biker himself and had ridden with various biker groups and that the obscenity and screaming on the tape was not atypical of how they talked when they were angry—but it did not indicate that they were violent. He testified, in effect, that members of biker groups simply talk that way much of the time. Mr. Raring identified himself as a securities lawyer who had an interest in constitutional issues and had represented Coones (and others) in cases where he believed they were discriminated against simply due to their associations, and the like. (He was not asked to come to court; however, he was interested and came to watch the proceedings because of his previous representation of Coones. When he heard the government's tape played, he identified himself to Coones' present defense counsel and volunteered to testify about the lack of threatening significance in Coones' conduct on the phone.)

In short, the alleged threatening nature of Coones' history or any of Coones' known character traits is not as great as that of numerous other defendants in criminal cases—defendants who are routinely released without adverse consequence pending trial. Again, all risk can never be avoided; however, with the conditions of release set forth below, the magistrate judge concludes that the likelihood of Coones presenting a danger to the community is remote. (As to the requirement in the statute that a defendant not pose a threat to "any person" as well as to the community, the government has not identified any person who is allegedly at risk, except the individual referred to above who denied ever feeling threatened.)

Turning to the risk that Coones will flee if released, the issue is closer. The question of how much doubt a judge must have about a defendant's promise not to flee before the judge can order pretrial detention was not addressed by Congress. Nor has the question been addressed by other courts. While higher courts have stated that the government has the burden of proof by a "preponderance of the evidence", the magistrate judge does not consider this standard as requiring the government to show that a defendant "probably" will flee. Conversely, merely finding that a defendant "probably" will make future court appearances if released on bail is not a sufficient basis for releasing him. This would be setting an unreasonably low standard that would tolerate, for example, the pretrial flight of 49% of defendants, as long as 51% did not flee.

The proper standard to apply to assess the risk of flight cannot be stated in numerical probabilities. As indicated above, all possible risk can never be eliminated except by keeping a defendant locked up from the time he is first arrested until he is tried. In this country, where individual freedom is so prized, gaining total assurances that a defendant will not flee—at such a cost to liberty—is plainly inconsis-

tent with our values. Yet, our system of justice cannot work if there is no reasonable assurance that defendants will be in court when they are supposed to be. Jurors are called, witnesses are subpoenaed, defense counsel and law enforcement officers and prosecutors set aside time from other pressing duties, judges set calendars that preclude other litigants from using the courts, victims of crime and the public at large await justice—and all these processes and concerns are mocked and frustrated when a defendant fails to appear for trial.

In view of all these considerations, setting conditions of release of a defendant prior to trial requires that the judge find— based on experience and all the facts and circumstances of the case—that all interested people can reasonably assume that the trial will go on schedule. In other words, any person stating an intent to attend the trial should not have to preface his statement with "if the defendant shows up . . . ." It should be taken for granted that the defendant will be there.

Turning to the facts of this case, the government presented a strong case, which, if unrebutted, would have justified the magistrate judge in ordering that Coones be held in custody pending trial. The magistrate judge accepted the government's contention that its case against defendant on the present charges was substantial. Thus, Coones may reasonably fear that he will be convicted. More importantly, if convicted, he is facing a term of imprisonment of many years and possibly life. This may be a powerful motive for him to flee, rather than waiting to be imprisoned.

Coones offered unrebutted evidence that he has been a resident here for 25 years. He has no criminal record since the 1983 conviction discussed above. His two children are in his care, and they both live with him. His motorcycle business is here.

Coones' girlfriend also testified, without rebuttal, that Coones was aware that law

enforcement was coming for him (apparently because they had first gone elsewhere and he had received a telephone call that they were looking for him). He did not attempt to flee; instead, he waited and then went outside with his hands up when the officers arrived. This is some indication that he does not intend to flee, although it may also simply reflect that he did not know the seriousness of the charges.

Based on the foregoing considerations alone, the magistrate judge would not have been sufficiently confident that defendant would not flee to warrant releasing him on bail. Although to flee he would have had to give up his long residence and business and abandon his children here, the magnitude of the potential sentence Coones is facing if convicted would have reduced the magistrate judge's confidence below the level necessary to set conditions of release. Defendant presented other compelling evidence, however, namely, the testimony of all of the witnesses and proffers of proposed sureties, that convinced the magistrate judge that defendant was not a significant flight risk.

Taken all together, it is apparent that people who have known Coones for many years all have complete confidence that he is not going to violate the conditions of his release or flee to avoid being tried. They have testified, or offered to testify, under oath to this, all believing that they would have to deed their property and never get it back, as well as each being liable for the rest of a large dollar claim, if their assessments of defendant's intentions are erroneous.

The government was allowed to cross-examine the proposed sureties in detail (except those whose positions were presented by proffer of defense counsel) and raised no doubt in the magistrate judge's mind that the sureties were sincere in their beliefs that defendant would appear at future proceedings if released on bail. There was utterly no reason to believe that they were duped by defendant—they have known him personally for years—or that they would simply pay a total of over a million dollars to enable defendant to escape.

Nor is there reason to believe that the sureties stand to lose nothing if Coones flees. There is no evidence that Coones gave the proposed sureties sums of money remotely sufficient to cover their losses if he jumps bail. Nor is there evidence that he has large sums stashed away to compensate them after he flees. It appears that he is not living a lavish lifestyle or that large sums of money have passed through his hands. If income was being generated to which Coones had access during the conspiracies alleged in the complaints, it appears that the conspiracies have been broken by the arrests of the various co-conspirators, and the likelihood that he could and would attempt to engage in illicit activities in light of the attention he has received from law enforcement is slight.

Based on all the circumstances, the magistrate judge concludes that the conditions set forth below will reasonably assure the presence of Coones at future proceedings and will reasonably assure that he will not pose a danger to any person or to the community, if released from custody. The principal conditions are that he will be subject to home confinement with electronic monitoring of his whereabouts, that he will be subject to intensive supervision by a pretrial services officer, and, most importantly, that the people who know his character best, the witnesses referred to above, will demonstrate their confidence by posting the bonds as set below. By the standards applied above, these are sufficient conditions, despite the fact that all possibility that plaintiff will not betray the trust of his sureties can never be guaranteed.

**6. Changes of circumstances may warrant modification of conditions of release.**

Detention hearings, like this one, often take place at a time when neither counsel

has had any significant time to research the facts and prepare for the hearing. While the government obviously investigated Coones for many months before arresting him, it did not have an opportunity to investigate some of the proposed sureties at all. Some sureties, however, were made known through a Pretrial Services report three days before the hearing. In any event, the government expressed frustration at the circumstances that counsel perceived as rendering him without information to combat Coones' position at the hearing.

Some forms of surprise always occur at detention hearings. The government often proffers surprising testimony by law enforcement officers who, for various reasons, cannot be cross-examined by defense counsel. On the other hand, in this case, the government commendably gave defense counsel advance notice that it would play the tape of Coones' obscene, threatening telephone conversation. Defense counsel contacted the man threatened and proffered the explanation described above. Government counsel expressed no small aggravation and frustration at not being given advance notice of the proffer, so that it could be investigated.

The courtroom was full of spectators, and the magistrate judge noticed that several spectators expressed visible amusement that the government felt handicapped. The magistrate judge noted on the record that whether defense counsel could have given notice of his intent to make the proffer or not[3], the Constitution was biased in favor of the defendant and did not require advance disclosure. This does not mean, however, that the Court cannot use procedures that will avoid unduly handicapping either side.

As noted above, a great deal of testimony has been taken, and counsel on both sides have had to prepare at a fast pace to obtain information to address the issues. Errors or inadequacies in proffers and presentations of information and the inability to respond to surprises are inevitable. But these deficiencies should not be outcome decisive. Accordingly, the magistrate judge contemplates that either side may move for reconsideration or modification of the order below, if new information warrants it.

If the government develops new probative information or learns that the defense proffers of evidence at the hearing were misleading, the magistrate judge will entertain a motion by the government to reconsider the order.

Conversely, if the defense develops new probative information or learns that the government's proffers of evidence at the hearing were misleading in a way that may affect the conditions of release, defendant may move for reconsideration. In regard to the conditions set below, the magistrate judge has set specific dollar amounts for each surety. The amounts to be secured by posting of property have been set in amounts slightly less than the equity in each property proposed to be posted. The purpose of setting slightly reduced amounts was to avoid the need to seek a modification of the order if an appraisal of any property is slightly less than testified to. Nothing herein is to be interpreted, however, as precluding either side from moving for an order modifying the amounts or other conditions set below, for good cause.

### 7. Order.

Based on the forgoing, it is ORDERED that the government's motion for detention is DENIED, and defendant Coones is ordered released subject to the following:

(a) All terms and conditions on the current bail form for this district shall

---

**3.** Defense counsel explained, in substance, that the development of information for the proffer was close to the time of the hearing.

apply to defendant in addition to those that follow;

(b) Coones shall

A. sign an unsecured appearance bond in the amount of $4,000,000;

B. submit to intensive Pretrial Services supervision;

C. surrender his passport to the Court Clerk;

D. be restricted to his residence at 12341 Walnut Avenue, Garden Grove and submit to electronic monitoring at his own expense;

E. not use or possess any illegal drugs;

F. submit to drug and alcohol testing as deemed necessary by Pretrial Services;

G. possess no firearms or destructive devices; and

H. submit to unannounced inspections by Pretrial Services as deemed necessary by Pretrial Services to ensure compliance with the conditions hereof; and

(c) Billy Aguilar shall post an appearance bond in the amount of $75,000, with justification and deeding of property sufficient to cover $50,000 thereof;

(d) Guy Castiglione shall post an appearance bond in the amount of $350,000, with justification and deeding of property sufficient to cover $270,000 thereof;

(e) Johnny Pagnini shall post an appearance bond in the amount of $300,000, with justification and deeding of property sufficient to cover $210,000 thereof;

(f) Daniel Roberts shall post an appearance bond in the amount of $100,000, with justification and deeding of property sufficient to cover $70,000 thereof;

(g) Kathryn Ornelas shall post an appearance bond in the amount of $100,000, with justification and deeding of property sufficient to cover $20,000 thereof;

(h) Ruth Davis shall post an appearance bond in the amount of $15,000, secured in part by a cash deposit of $10,000;

(i) Ron Simms shall post an appearance bond in the amount of $1,600,000, with justification and deeding of property sufficient to cover $1,000,000 thereof;

(j) Scott Karnes shall post an appearance bond in the amount of $160,000, with justification and deeding of property sufficient to cover $105,000 thereof;

(k) Ron Berryman shall post an appearance bond in the amount of $45,000, with justification and deeding of property sufficient to cover $25,000 thereof; and

(l) The legal entities or persons having legal title to the real properties of the Oakland, California Chapter of the Hells Angels shall post an appearance bond in the amount of $250,000, with justification and deeding of property sufficient to cover $190,000 thereof; and

IT IS FURTHER ORDERED THAT defendant Coones shall not be released prior to the later of:

- June 29, 1999, or
- if any party moves for reconsideration or appeals from the conditions of this order before June 29, 1999, the date such motion is decided, and

IT IS FURTHER ORDERED THAT if the government declines to approve any affidavit of surety tendered by a surety identified above, either the government or defendant may apply on one day's notice to the magistrate judge for a determination whether the affidavit is adequate or whether examination of the surety in court is required; and

Either party may apply to Magistrate Judge Edwards for reconsideration of the conditions hereof, based on new evidence not previously made known to the magistrate judge or based on a manifest showing that the magistrate judge did not consider material facts or relied on plainly erroneous interpretations of law. All other appeals or applications for modification of the conditions hereof must be made to the criminal duty district judge or other designated district judge.